WILSON, Administratrix, Appellant, vs. CHIPPEWA VALLEY ELECTRIC RAILROAD COMPANY, Respondent.

*February 5—February 23, 1904.*

*Interurban railroads: Negligence: Wanton and wilful injury at highway crossing: Court and jury: Evidence: Direction of verdict: Pleading: Cause of action.*

1. In an action against an electric railroad company operating an interurban line, for the negligent killing of plaintiff's intestate in a collision with a runaway team at a highway crossing, the complaint charged that the defendant's agents wantonly and wilfully ran the deceased down, with such gross negligence as to amount to an intention on their part to inflict injury to the deceased. The action was tried on the theory that these facts must be shown. *Held,* on the evidence, stated in the opinion, that the case presented was one for the jury, and that the direction of a verdict for defendant was erroneous.

2. In an action for personal injuries charged to have been committed in such a wanton and wilful manner as to amount to an intention to inflict the injuries, there can be no recovery on testimony showing a want of ordinary care, even though gross negligence or intentional wrong is not proven.

APPEAL from a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge. *Reversed.*

At 4 o'clock p. m. on the 14th day of December, 1901, one David Wilson, while crossing the defendant's track in a sleigh drawn by two horses, was run down and killed by one of defendant's electric cars, and this action is brought by his widow and administratrix to recover damages for his death. The complaint charges gross negligence, or, more accurately, such wilful and wanton acts as amount to intentional killing. A verdict for the defendant was directed at the close of the evidence, and the plaintiff appeals from judgment thereon.

The evidence showed that the place where the accident took place was a highway crossing known as "Smith's Crossing." Though within the city limits of Eau Claire, it was so far on the outskirts as to be practically a country crossing.

At this point the defendant's track runs northeast and south-west; the same being an interurban line between the cities of Eau Claire and Chippewa Falls, over which the defendant operated cars at stated intervals. The track was upon a fenced right of way, and both track and right of way were in all essential respects maintained like those of the ordinary railroad. Immediately adjoining and parallel to the right of way upon the southeast was the right of way and track of what is commonly called the "Omaha Railway," and immediately adjoining this, again, was the track and right of way of the Wisconsin Central Railway; the track of the Omaha Road being ninety-six feet from the defendant's track, and the track of the Central being 137 feet from the Omaha track. The highway on which the deceased was driving ran directly east and west, crossing all three of the tracks at grade. The car which ran down the plaintiff was approaching the crossing from the northeast, and was an interurban car, going at from twenty to twenty-five miles per hour. The deceased, with one Howard, was approaching the crossing from the east. The day was cold, and both men were well muffled up. The horses were owned by the deceased, and were young and high-spirited, and had run away at least twice before; the last time being on the day of the accident. It appears that, from the time when a traveler approaching the tracks from the east reaches a point 150 feet east from the defendant's track up to the time when he crosses the track, he has an unobstructed view to the north, and can see a car approaching for more than a mile, and can, of course, himself be seen from the car. The plaintiff introduced evidence tending to show that the team which the deceased was driving got beyond his control and commenced to run away just before reaching the Wisconsin Central track, at a point about 313 feet east of the crossing over the defendant's track, and that they continued running away till they crossed the defendant's track; that at the time they commenced to run,

or when first seen running, the defendant's car was about 350 feet north of the crossing; that the defendant's motorman saw Wilson's team approaching, and made no attempt to stop his car until after it had struck the sleigh in which the deceased was riding. On the other hand, the defendant's evidence tended to show that the team did not commence to run until it passed the Omaha track, and that the motorman attempted to stop the car when he saw the team commence to run. It was undisputed that the car struck the sleigh, throwing one of the men a distance of thirty-seven feet, and the other a distance of fifty-three feet, killing them both, and that the car ran several hundred feet beyond the crossing before stopping.

For the appellant there was a brief by *Wickham & Farr,* and oral argument by *James Wickham.*

For the respondent there was a brief by *Frawley, Bundy & Wilcox,* and oral argument by *R. P. Wilcox.*

WINSLOW, J. The complaint charges that the defendant's agents wantonly and wilfully ran the deceased down, with such gross negligence as to amount to an intention on their part to inflict injury on the deceased. The action was tried on the theory that these facts must be shown. The trial court directed a verdict because it deemed that there was no credible evidence tending to show such facts, and the question now presented is whether this direction was right. We are convinced that this question must be answered in the negative. There were ten or more passengers in the car as it approached the place of accident. It is admitted that it was running at a speed of from twenty to twenty-five miles an hour. It is an unquestioned fact that, as the car approached the crossing from the northeast, the deceased, in his sleigh, was approaching the crossing from the east, and that both car and sleigh reached the crossing at the same instant of time, and that at that time the speed of the car had

been only slightly diminished, if diminished at all. It is admitted also by the motorman that he saw the team of the deceased coming from the east just as it approached the Wisconsin Central track, being something over 230 feet from the crossing in question, though he says they were then trotting, and did not commence to run until they had crossed the Omaha track, when he at once shut off the current, set the brake, and put on the reverse current. Doubtless, if the evidence stopped here, we should be obliged to affirm the ruling of the trial court, for it could not be said from these facts that there was anything which showed either intentional injury on the part of the motorman, or that degree of reckless disregard of consequences indicating a willingness to injure which is equivalent in the law to an intent to injure. A motorman is not obliged to check his speed or stop his car every time he sees a team approaching which is under control. *Eastwood v. La Crosse C. R. Co.* 94 Wis. 163, 68 N. W. 651. But there is other testimony in the case which must be considered. A young man named Peck was one of the passengers on the car, and was sitting toward the rear end, on the east side. He testifies that as the car approached the crossing, and was about 350 feet distant therefrom, he looked over his shoulder out of the window of the car, and saw the deceased and his team at a point just opposite the bicycle arch (a structure on the south side of the highway), being by measurement eighty feet east of the Central crossing, and 313 feet east of the defendant's crossing; that the team was then frightened, and running west toward the crossing; that everything indicated that they were running away; they were running too fast to be running for the fun of it; that he (witness) got right up and started for the front end of the car; that he looked at the motorman as he was walking to the front, but the motorman made no effort to stop the car; that, as he got to the front end of the car, he looked out again at the team, and they were just coming over the Omaha

track, still running; that he turned, and looked at the motor-
man again, and he was doing nothing to stop the car; then
in an instant came the collision, and he looked out of the
window on the other side of the car, and saw the team run-
ning down the street with the pole and whiffletrees alone.
There was evidence by other witnesses to the effect that the
motorman did nothing to stop the car until almost the mo-
ment of collision, or the moment after the collision. If these
were indeed the facts, they furnish ample basis for the con-
clusion that the motorman was guilty of a gross and wanton
recklessness in operating his car, which amounted to an utter
disregard of human life and limb, and thus was within the
rule of gross negligence, as recently laid down in the case of
*Bolin v. C., St. P., M. & O. R. Co.* 108 Wis. 333, 84 N. W.
446. The motorman admits that he actually saw the team
just as they were coming onto the Central track, about 230
feet east of the fatal crossing, but he also testifies that they
were then under control. It certainly will be admitted by
all that if the motorman in charge of an electric car going
at a high rate of speed sees a runaway team approaching a
crossing under such circumstances as must suggest to any
mind that a collision is probable, and makes no effort to con-
trol or stop his car, but allows it to run down the team and
driver, he is guilty of that wanton and reckless disregard of
human life which amounts in the law to intentional wrong.
On this proposition there is no room for two opinions.

It seems to have been the idea of the trial court in this
case that because the witness Peck admittedly did not see the
team from the point 313 feet east of the crossing until it
reached the Omaha crossing (a distance of 217 feet), and be-
cause another witness testified that he saw the team between
these points, and that they were not running, but going at
a trot, the fact that the team was running away at any point
during the progress of the 217 feet is disproven. We cannot
agree with this contention. If Peck's story is to be believed

(and his testimony is certainly not intrinsically incredible, nor is it conclusively disproven), then the facts were that both team and car were approaching this crossing at about the same speed, namely, between twenty and twenty-five miles an hour; that when the team was 313 feet distant it was running away; that when ninety-six feet distant it was running away; that it reached the crossing at the identical moment that the car reached the crossing. These facts certainly would justify the inference that the team was running away during the whole 313 feet, because it must have kept up its speed, and testimony that it was walking or only slowly trotting for a part of the time would not necessarily overcome the inference. So we arrive at the conclusion that the case was one for the jury, and that the direction of a verdict for the defendant was erroneous.

Another contention made by the plaintiff is that in any event there was testimony in the case showing a want of ordinary care on the part of the motorman, and that there might be a recovery on this ground, even though gross negligence or intentional wrong was not proven. It is true that some courts have held that, notwithstanding gross negligence is charged, there may be a recovery on the ground of want of ordinary care only. *Keating v. D., B. C. & A. R. Co.* 104 Mich. 418, 62 N. W. 575; *Hays v. G. St. R. Co.* 70 Tex. 602, 8 S. W. 491; *Claxton's Adm'r v. L. & B. S. R. Co.* 13 Bush, 636; *Rockford, R. I. & St. L. R. Co. v. Phillips,* 66 Ill. 548. On the other hand, a number of courts have arrived at the opposite conclusion. *Highland Ave. & B. R. Co. v. Winn,* 93 Ala. 306, 9 South. 509; *Louisville, N. A. & C. R. Co. v. Bryan,* 107 Ind. 51, 7 N. E. 807. This court has held that, where the complaint simply charges negligence or want of ordinary care, there can be no recovery on the ground of wilful injury, or that reckless and wanton disregard of another's rights equivalent to wilful injury, which has been termed "gross negligence," because this is a different cause

of action. *McClellan v. C. V. E. R. Co.* 110 Wis. 326, 85 N. W. 1018. Is the converse of the proposition true? We think it must logically be so held. In the case of *Bolin v. C., St. P., M. & O. R. Co. supra,* this court very carefully examined the doctrine of gross negligence, and reviewed the authorities on the subject. The conclusion there reached was that there had been inaccuracy at times in the decisions in the use of the term "gross negligence;" that whenever negligence, properly so called, was the foundation of the action, contributory negligence on the part of the plaintiff would defeat a recovery, no matter how great the negligence of the defendant; that, in order to constitute "gross negligence," as it has been called (i. e., that degree of misconduct for which a recovery may be had notwithstanding contributory negligence), there must be charged and shown either a wilful intent to injure, or that reckless and wanton disregard of another's rights and safety, and that willingness to inflict injury, which the law deems equivalent to an intent to injure. It was shown that in a wrong of this nature there is really no element of inadvertence, which is a necessary element of negligence, and hence that the term "gross negligence," as applicable to this class of wrongs, is inaccurate. The conclusion is that when this kind of a wrong is charged, as in the present case, though it be called "gross negligence," it does not logically include ordinary negligence, any more than a charge of ordinary negligence includes intentional wrong, and hence the appellant's contention in this regard must fail.

It is not deemed necessary to discuss any other questions.

*By the Court.*—Judgment reversed, and action remanded for a new trial.