WILLARD, Respondent, vs. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*May 16—June 4, 1912.*

*Railroads: Negligence: Gross negligence: Injury to horses in car: Contract limiting liability: Agreed valuation: Damages: Principal and agent: Authority of drover to act for shipper.*

1. In order to constitute gross negligence there must be either a wilful intent to injure, or that reckless and wanton disregard of the rights and safety of another or of his property, and that willingness to inflict injury, which the law deems equivalent to an intent to injure.    The element of inadvertence must be wanting.

2. Evidence that horses shipped by plaintiff on the defendant's railway were placed in a box car which was switched upon a sidetrack, and that thereafter another car was pushed in upon such track and against the car containing the horses with sufficient violence to cause it to collide with a third car standing a few feet away, breaking the halters of the horses and throwing them down or upon their haunches, does not show gross negligence on the part of defendant, there being nothing to show that the manner of switching the second car and the consequences thereof were not the result either of pure accident or of that inadvertence which amounts to ordinary negligence only.    The question of gross negligence should, therefore, not have been submitted to the jury.

3. It is competent for a shipper and a railway company to agree upon a valuation in case of injury, in consideration for which

agreement the railroad company accepts a lower rate of freight
than it would otherwise be entitled to; and in such case a
recovery by the shipper for an injury resulting from ordinary
negligence should be limited to the amount agreed upon.

4. In the absence of evidence to the contrary, a drover in charge
of a shipment of horses has authority to enter into a contract
fixing the value of the animals shipped and limiting the maxi-
mum liability of the carrier to such valuation.

APPEAL from a judgment of the circuit court for Sauk
county: E. RAY STEVENS, Circuit Judge. *Reversed.*

Action to recover damages for injuries to horses in ship-
ment. The complaint alleged that on or about the 15th day
of June, 1910, the defendant railway company, as common
carrier, received three race horses of the plaintiff at Reeds-
burg, Wisconsin, for shipment to Austin, Minnesota; that
defendant, in violation of its duties, negligently injured said
horses, to plaintiff's damage in the sum of $1,500. The com-
plaint contained two counts, one charging ordinary negli-
gence and one charging gross negligence. The answer of
the defendant contained a general denial and, as a separate
defense, alleged that it agreed to receive and transport said
horses "under and in pursuance and by virtue of a written
contract, in and by which contract the value of the horses
mentioned in plaintiff's complaint is declared and agreed
to be not more than $100 each; that in and by said contract
the liability of the defendant was in any event limited to
said declared valuation of $100; that defendant's tariffs,
schedules, and classifications relating to such shipments and
the conditions and limitations therein contained were, at and
prior to the time said shipment was made, duly made and
had been duly filed as required by law, and of the same the
plaintiff had due notice; that in and by said tariffs, sched-
ules, and classifications it was provided that the rate or tariff
for shipping horses declared to be of the value of $100 should
be sixty cents per hundred pounds, the minimum weight of
the animal to be 2,000 pounds; that where the declared value

exceeded $100, an addition of twenty-five per cent. should be made to the rate per hundred pounds; that in and by said tariffs, schedules, and classifications it was further provided that animals exceeding in value $8.00 per head, or when no value was given, would be taken only by special arrangement; that plaintiff's horses were shipped at the rate provided in and by said tariffs, schedules, and classifications where the declared value was not in excess of $100, all of which plaintiff knew;" and demanded judgment that the action be dismissed.

The jury, by special verdict, negatived the charge of ordinary negligence, found the defendant guilty of gross negligence, and assessed plaintiff's damages in the sum of $1,250.

The defendant moved for judgment upon the merits and undisputed evidence notwithstanding the special verdict; for an order setting aside the special verdict and for judgment upon the undisputed evidence; for an order changing the answer to the second question of the special verdict from Yes to No, and for judgment upon the special verdict as thus changed; in the event of the denial of those motions, for an order setting aside the special verdict and for a new trial, upon the usual grounds: all of which alternative motions were denied, and judgment rendered for the plaintiff on the special verdict, from which judgment the defendant appealed.

For the appellant there was a brief by *William G. Wheeler,* attorney, and *Edward M. Smart,* of counsel, and oral argument by *Mr. Smart.*

For the respondent there was a brief by *Grotophorst, Evans & Thomas,* and oral argument by *E. A. Evans.*

VINJE, J.  The main question presented for review in this case is, Did the court err in holding that there was any evidence to establish gross negligence on the part of the defendant?  It appears that the plaintiff and his drover, Mills, took three horses to the depot at Reedsburg, Wisconsin, about

8 o'clock in the morning and loaded them into an ordinary box car on one of the sidetracks of the defendant company. No claim is made that the horses were not properly loaded. The car remained on the sidetrack until about 4 o'clock in the afternoon, when it was picked up by one of defendant's train crews and switched onto another track and left at a point about a few feet from another box car. Sometime thereafter the train crew pushed another car onto the track and against the car containing the horses with sufficient violence to injure the horse in question (named Sable Girl). It also appears that one of the other two horses received a slight injury and the third horse received some injuries, the precise nature of which is not disclosed by the testimony in this case. Only two witnesses testified as to how the injury occurred. These witnesses are the drover, Mills, who remained in the car with the horses, and Roy Mepham, who witnessed the accident while sitting on a platform about twenty-five paces from the car. The substance of the testimony of Mills as to how the injury occurred is as follows:'

"The horses were loaded about 8 o'clock in the morning and the company picked them up about 4 o'clock in the afternoon. They came along and picked me up and put me on the sidetrack, then they went back and got a heavy furniture car and threw it back against me on this sidetrack, and when it struck it struck another car behind a little ways from me and threw the horses down. I couldn't say it was a furniture car, it was a box car. When it struck I was with the horses, holding this mare. I was in front of them. It threw them back and broke the halter rope, and then when it went back against this other car with such force that it threw them back in the car. Sable Girl went back on her haunches in the corner of the car. I judge it would be about nine feet back to the end of the car, about half of the car. She landed right on her haunches in the corner. I got them standing up and fixed something to tie them up again. I saw the furniture car coming and I went back and took hold of her head. I stood in the doorway. The car Sable Girl

and the other horses were in was a box car. I couldn't tell how fast the furniture car was coming. It was coming endways right towards me from the west. There was another car to the east of our car, which, when our car was struck, our car moved into. They were just a few feet apart. She was thrown into the corner when our car struck the car to the east of me. The car struck the furniture car pretty hard. I continued in the car from there to Austin. I never left the car. That was the only jolt that I had anywhere. I took the horses out of the car at Austin, Sable Girl among them. When the furniture car struck our car, Donna Mack's halter broke. One of the other two horses was thrown down, Donna Mack. Donna Mack is a mare. She was thrown in the end of the car with this other mare."

The witness Mepham testified:

"I saw the collision Mr. Mills spoke about. This car, when the horses were loaded into it, was back of the house. There are two tracks at Reedsburg on that side, besides the main track. One the house track, and one the team track. This car was on the house track back of the freight house. It was taken from there on to the team track. I saw the collision while sitting on the high platform, probably about twenty-five paces from the car."

"*Q.* What did you notice when the car with the horses was struck? *A.* Why, I noticed it hit pretty hard."

"The middle of the car seemed to me to sort of raise some. I heard quite a scrambling in the car. I went over when the fellow yelled. He was holding the horses and he told me to get the boys, that the halter straps were broken, hollered for the boys."

This is all the testimony in the case as to the movements of the car upon which the verdict of gross negligence is based. The question is, Does such evidence sustain a finding of gross negligence? Plaintiff maintains that it does, and cites cases from other jurisdictions to sustain the claim; notably, the cases of *Chicago & N. W. R. Co. v. Calumet S. Farm,* 194 Ill. 9, 61 N. E. 1095; *Chicago & A. R. Co. v. Grimes,* 71 Ill. App. 397; and *Brockway v. Am. Exp. Co.* 168 Mass.

257, 47 N. E. 87. As pointed out in *Lockwood v. Belle City St. R. Co.* 92 Wis. 97, 112, 65 N. W. 866, and *Watermolen v. Fox River E. R. & P. Co.* 110 Wis. 153, 85 N. W. 663, our court has adopted a classification of negligence differing materially from that of many other courts, hence citations from other jurisdictions may not be of much value in determining what constitutes gross negligence in our state. This is especially true of cases from Illinois, where materially different classifications and definitions of negligence obtain. It is the settled law of this state that in order to constitute gross negligence there must be either a wilful intent to injure, or that reckless and wanton disregard of the rights and safety of another or of his property, and that willingness to inflict injury, which the law deems equivalent to an intent to injure. The element of inadvertence must be wanting. *Lockwood v. Belle City St. R. Co.* 92 Wis. 97, 65 N. W. 866; *Schug v. C., M. & St. P. R. Co.* 102 Wis. 515, 523, 78 N. W. 1090; *Bolin v. C., St. P., M. & O. R. Co.* 108 Wis. 333, 84 N. W. 446; *Watermolen v. Fox River E. R. & P. Co.* 110 Wis. 153, 85 N. W. 663; *Decker v. McSorley,* 116 Wis. 643, 93 N. W. 808; *Wilson v. Chippewa Valley E. R. Co.* 120 Wis. 636, 98 N. W. 536; *Gould v. Merrill R. & L. Co.* 139 Wis. 433, 121 N. W. 161; *Astin v. C., M. & St. P. R. Co.* 143 Wis. 477, 128 N. W. 265; *Henke v. Milwaukee E. R. & L. Co.* 147 Wis. 661, 133 N. W. 1107.

In the present case there is no evidence of an actual, wilful intent to injure plaintiff's property. It is not shown that the engineer or the switchmen engaged in moving the car knew that there were horses in the stationary car on the siding. Neither is there any evidence of that recklessness, wantonness, or rashness necessary to constitute what the law calls an intent to injure. The manner of switching the car and the consequences thereof, so far as the evidence discloses, were the result of either pure accident or of that inadvertence which amounts to nothing more than ordinary negligence.

Where a plaintiff charges gross negligence and the injury is one that might under the circumstances be the result of mere inadvertence, it is necessary, to sustain the charge, to have some evidence to take the injury out of the field of ordinary negligence. The burden is upon the plaintiff to show gross negligence, and such burden is not met by showing facts and circumstances amounting at most to only ordinary negligence. A failure to transmit or receive a signal at the proper time; a misunderstanding of signals; an error in judgment as to the distance between the moving and the stationary car, or as to the speed of the moving car; a slight defect in the brakes operated by the engineer, or a number of other causes attributable either to accident or inadvertence, would completely account for what happened. It is a matter of common knowledge that it does not require such a very great impact of cars to cause horses tied therein to break loose and fall down or back upon their haunches. Such results are of almost daily occurrence, due to accident or ordinary negligence. That being the case, a plaintiff charging gross negligence must show that the result was due to such negligence; that it was not produced by mere inadvertence. Both witnesses for the plaintiff characterize the impact as being "pretty hard,"—surely not very expressive language to denote gross negligence. The decision, however, should not turn upon the mere language used by witnesses. Nor has it in this case. We refer to the language simply to emphasize the fact that it accords with the rest of the proof, which shows, at best, only ordinary negligence. The trial court should not have submitted the issue of gross negligence to the jury upon the proof before it.

Respondent contends that even if gross negligence is not shown, the defendant could make no valid contract to limit its liability not to exceed the agreed maximum valuation,—in this case $100 per horse,—as such contract was clearly an effort to limit liability and not to agree upon a valuation,

and cites *Abrams v. M., L. S. & W. R. Co.* 87 Wis. 485, 58 N. W. 780. The contract in the case at bar provides:

"It is agreed between the owner and shipper of these animals and the said railroad company that in case of accident resulting in injury to said animals the value thereof shall in no case exceed the valuations named above."

The valuation named for each horse was $100. The proof shows that the horses were shipped at a reduced rate by reason of the provisions of the stock contract fixing the valuations therein named. The case of *Ullman v. C. & N. W. R. Co.* 112 Wis. 150, 88 N. W. 41, is decisive of respondent's contention. It was there held that it was competent for a shipper and a railway company to agree upon a valuation in case of injury in consideration for which agreement the railroad company accepts a lower rate of freight than it would otherwise have been entitled to, and that such an agreement was not one which exempted a railroad company from negligence, but was an agreement in advance of the maximum measure of damage to which the shipper should be entitled in case of an accident coming within the terms of the contract.

In the case of *Abrams v. M., L. S. & W. R. Co.* 87 Wis. 485, 58 N. W. 780, there was a mere limitation of maximum liability without reference to the value of the property at all. The distinction between such a situation and the facts in the *Ullman Case* was clearly pointed out by the court in the latter, and it was there held that a contract liquidating loss or damage in advance upon an actual or maximum value basis agreed upon and stated therein, was valid. See, also, *Donlon v. Southern Pac. Co.* 151 Cal. 763, 91 Pac. 603, 11 L. R. A. N. s. 811, and *Hart v. Pennsylvania R. Co.* 112 U. S. 331, 5 Sup. Ct. 151.

It is also claimed that no valid stock contract was made because Mills, the drover, had no authority to sign for plaintiff. It appears that as soon as the loading was done plaintiff left the horses in charge of Mills without having received any

bill of lading or stock contract or made any arrangement with the railway company. He left Mills to attend to that. Plaintiff's testimony on this subject is as follows:

"They were shipped in my name by me. I can't say whether I represented myself or whether my man did. The man's name was Mills. It was either Mills or me. . . . I couldn't say as to a stock contract. He must have had one, but I don't think he gave it to me. I have frequently shipped horses and always got a live-stock contract, also a bill of lading. I can't say sure whether I got a stock contract and bill of lading, or Mr. Mills got it."

In view of this testimony it is clear that plaintiff expected that Mills would attend to the shipping of the horses for him and would get a stock contract and bill of lading, and that he authorized him to do so in his behalf. In the absence of evidence to the contrary, a drover in charge of a shipment has authority to stipulate and to enter into a contract fixing the value of the animals shipped and limiting the maximum liability of the carrier to such valuation. *Squire v. N. Y. C. R. Co.* 98 Mass. 239; *Armstrong v. C., M. & St. P. R. Co.* 53 Minn. 183, 54 N. W. 1059. Mills was the only person with whom the defendant came in contact and with whom any arrangement was made for the shipping of the horses. He was in charge of them and, for the purpose of shipment, stood in the position of an owner. This would be so in the absence of any evidence to show that plaintiff put him in charge of the property, and is especially so where, as here, the owner expected him to receive a stock contract and bill of lading. Plaintiff's own testimony clearly shows that he delegated to Mills authority to sign the stock contract and receive the bill of lading.

The defendant admits liability in the sum of $100, the stipulated value of the horses in the stock contract. The judgment of the trial court is reversed, and the cause remanded with directions to enter judgment in favor of the plaintiff for the sum of $100.

*By the Court.*—It is so ordered.