CLEMENS, Plaintiff in error, vs. THE STATE, Defendant in error.

*June 2, 1921—March 14, 1922.*

*Criminal law: Homicide: Credibility of witnesses: Question for jury: Negligence: Manslaughter: Culpable negligence: Violation of automobile statutes: Conviction based on improper statute: Trial: Verdict received in absence of defendant and counsel.*

1. The evidence in a criminal case being in sharp conflict, it was a question for the jury to determine from all the evidence as to which side was telling the truth, which testimony it considered credible or otherwise and which it would believe, and having found a verdict it cannot be disturbed on appeal.

2. Ordinary negligence consists of a want of that care and prudence that the great majority of mankind exercise under the same or similar circumstances.

3. The defendant was properly convicted of manslaughter in the fourth degree, though he was not guilty of gross negligence, under secs. 4337, 4363, 4365, 4367, Stats., and a conviction was proper where the accused inadvertently ran into a stationary motor truck with an automobile while violating sub. 1, sec. 1636—52a, relating to lights on motor vehicles, and the statute relating to speed, the term "involuntary" signifying inadvertence, and the term "culpable negligence" not requiring gross negligence.

4. In a prosecution for manslaughter in the fourth degree, aris-
ing out of a violation of the statutes relating to lights on
motor vehicles, a conviction was not reversed where both
counsel and court were under the erroneous impression that
sec. 1636—52, Stats. 1917, was in effect, instead of sub. 1,
sec. 1636—52a, Stats. 1919, no exceptions having been taken
to the instructions of the court nor proper instructions asked,
and the Statutes of 1919 not being more favorable to the
accused than the Statutes of 1917, and plaintiff in error
having admitted that his headlights threw a light ahead not
to exceed forty feet.

5. It was not reversible error to permit the jury to return a ver-
dict in the absence of the accused and his counsel, where the
court informed the accused and his counsel that if the jury
reached a verdict before 9 or 10 o'clock that evening he
would be in attendance to receive it, and the sheriff noti-
fied counsel for the accused by telephone when the jury was
ready to return its verdict.

ERROR to review a judgment of the municipal court of
Milwaukee county: CHESTER A. FOWLER, Acting Judge.
*Affirmed.*

The case is stated in the opinion.

*C. F. Rouiller,* attorney, and *W. B. Rubin,* of counsel,
both of Milwaukee, for the plaintiff in error.

For the defendant in error there was a brief by the *At-
torney General, Winfred C. Zabel,* district attorney of Mil-
waukee county, and *George A. Shaughnessy,* assistant dis-
trict attorney, and oral argument by *Mr. Zabel* and *Mr.
Shaughnessy.*

The following opinion was filed November 15, 1921:

DOERFLER, J. The plaintiff in error was convicted on
the 1st day of April, 1920, of the crime of manslaughter
in the fourth degree. The case was tried in the municipal
court of Milwaukee county before the Hon. CHESTER A.
FOWLER, judge presiding, and a jury, and the plaintiff in
error was sentenced to serve a term of six months in the
house of correction of Milwaukee county. A writ of error

was brought to review the conviction of the plaintiff in error on said charge.

On the 28th day of December, 1919, one Theodore Thomas and one William Logeman were returning from the country and were being conveyed in a Ford truck owned by Mr. Thomas along what is known as the Janesville plank road, running from Hales Corners, a small village located a distance of about ten miles southwest of the city of Milwaukee, in Milwaukee county, in a northeasterly direction, towards said city. Said Janesville plank road has located thereon a concrete strip eighteen feet in width in the center thereof, and on each side of said concrete strip there is a strip of dirt road about six feet in width. South of the dirt road a distance of about nine and one-half feet is a fence, and between the fence and the edge of the dirt road is a gully. Not far distant from Hales Corners, towards Milwaukee, on said plank road is a hill about three blocks in length, known as Kelly's Hill, sloping from the west towards the east, and the collision in question occurred a distance of about one half to one quarter of a mile northeast of the foot of Kelly's Hill, on a portion of the Janesville plank road which is practically level.

When Thomas, with his truck, arrived at the point of the collision, he stopped his car so that about one half thereof was located upon the south side of the cement road and one half thereof on the dirt road. The stop was made for the purpose of pouring water into the radiator, which had become greatly heated, and while Logeman, one of the occupants of the automobile truck, after having filled the radiator with cold water from a can which he took from the rear of the truck, had returned to the rear of the truck, and while facing the east, and while replacing the empty can on the rear of the truck, Thomas was located in front of the truck, engaged in cranking the same, and at this time the collision took place.

It also appears that *Clemens* was operating a Chandler five-passenger touring car and was accompanied on his trip by one Hobart.

The collision took place at about 5 o'clock in the afternoon, at a time when darkness had not yet fully set in, and the testimony shows that even without the aid of artificial light at that time a person could see a considerable distance, there being a dispute in the evidence, some of the witnesses claiming that the distance at which an object could be clearly seen at that time was not to exceed one hundred feet, and other witnesses testifying to a considerably greater distance.

Thomas had lit the lights on his automobile when he was about two miles from the place of the accident, and *Clemens* also claims that his lights had been lit while still some considerable distance from the place of the accident. *Clemens* and his witnesses testified that the Thomas car when it stopped had no tail light lit, while a number of witnesses for the state testified that the tail light was lit.

It is claimed by Logeman, a witness for the defendant in error, that when the *Clemens* car collided with the Thomas car it lifted up the rear end and forced it ahead for a distance of from twenty-five to thirty feet, and that the *Clemens* car ran an additional thirty-five to fifty feet beyond the place where the Thomas car stopped, so that in endeavoring to stop his car at the point of collision the plaintiff in error continued to run a distance of at least seventy feet before his car was stopped. Thomas was thrown under his truck, and on an examination it was ascertained that he was seriously hurt, and after being conveyed to a nearby saloon he died shortly after, during the same evening, as the result of pulmonary hemorrhage of the lung, caused by a fractured rib penetrating the same.

The witness Logeman, for the state, testified that the road was pretty good, but slippery in certain places; that he did not know whether the tail light on the Thomas car

was lit at the time of the collision.    He heard no noise and no horn or signal, and did not see the *Clemens* car as it approached.    That after the accident Mr. Hobart, who accompanied *Mr. Clemens* in his car, claimed that he was so blinded by the glaring headlight of the approaching car belonging to Mr. Mueller, coming from the east and going west, that he was unable to see the Thomas car.

J. C. Mueller, a witness for the state, testified that on the evening of the accident he drove a new Ford sedan from the city of Milwaukee out on the Janesville plank road towards Hales Corners; that at the time *Mr. Clemens'* car approached the Thomas car it was going at about thirty-five miles an hour; that the first he saw of the *Clemens* car was when it was at the top of Kelly's Hill, a distance of about one half a mile from where he then was.    All he could see at that time were the lights on the front of the car; that at the time of the happening of the accident he was about 150 feet away from the place where it occurred; that he had put on the dimmers quite a distance before he reached the place where the accident occurred and at the time when he saw the *Clemens* car coming down the hill.

Mrs. William Loman, a witness for the state, testified that she was sitting in the rear seat of Mueller's automobile; that when she first saw the *Clemens* car coming down Kelly's Hill she made the remark to Mr. Mueller, "I would slow down; he is coming very fast."    In her judgment the *Clemens* car was going at the rate of thirty-five miles an hour.    She also testified that Mueller's dimmers were on, that the Mueller car was going between ten and fifteen miles an hour; that at the time she first saw the *Clemens* car the Mueller car was about three quarters of a mile from it, and she saw the *Clemens* car and the Thomas car at the same time.    The *Clemens* car was going over twice as fast as the Mueller car.

Mr. Franklin J. Mueller, fourteen years of age, a witness for the state, testified that he was in the Mueller car,

and that he first noticed the Thomas car at a distance of about eight or nine blocks, and that at that time the *Clemens* car was over a mile away from where he then was; that Mr. Mueller, his father, turned on the dimmers of his car when he saw the *Clemens* car coming down the hill.

All of the witnesses for the state testified substantially that after the accident *Clemens* did everything in his power to aid and assist Thomas.

The plaintiff in error testified in his own behalf that he was forty-two years of age, a married man, and had been employed by the Chicago, Milwaukee & St. Paul Railroad Company for a period of two years and eight months; that he had never been arrested before; that he did not see the red light on the Thomas car, and that there was no red light burning on that car that night, either before or after the accident; that he had green shade lights on his car and that they were lit; that his headlight threw a light a distance of about thirty to forty feet; that he had never driven the car before with the headlights in that condition, although he knew they were in that condition that afternoon. He further testified that his car was going at the rate of fifteen miles an hour; that when the collision occurred the Thomas car was pushed ahead a distance of about twenty feet; that he did not see the Ford truck—it was too dark; that before the accident there was a car coming from the opposite direction from the city, and that he later found out that this was the Mueller car; that the dimmers on the Mueller car were not on, and that the glaring lights from the Mueller car blinded him; that when he approached the Mueller car he turned to the right on the road, slackened down the speed and put on the brakes, and that the reason he turned to the right was to permit the Mueller car to pass, and that at that time the collision took place.

Mr. Hobart, a witness for the plaintiff in error, testified that he was twenty-seven years of age, a traveling salesman, and accompanied *Mr. Clemens* in his car on the eve-

ning of the accident; that immediately before the accident *Clemens* was operating his car at the rate of between thirteen and sixteen miles an hour; that he did not see the Thomas car because his sight was blinded by the glaring headlights of. the approaching Mueller car; that at the time the *Clemens* car was stopped it was about even with the Thomas car.  At the time of the collision he could not see an object the size of a man in front of him a hundred feet away; that when *Mr. Clemens* saw the bright lights he slackened his speed and turned to the right of the road, and the next thing that the witness noticed was the collision.

The testimony thus detailed shows that there was a sharp conflict between the witnesses for the state and those of the plaintiff in error as to the speed of the *Clemens* car immediately prior to the happening of the accident, the state's witnesses having testified that such car was running at a rate of speed in excess of thirty miles an hour, and the witnesses for the plaintiff in error testifying that the *Clemens* car was running at a rate of speed not in excess of fifteen miles an hour.   The witnesses for the state testified that the Mueller car had, a considerable distance before it reached the Thomas car, its glaring headlights shut off, and that the dimmers thereof were turned on.   On the other hand, the witnesses for the plaintiff in error testified that the dimmers on the Mueller car, immediately preceding the accident, had not been turned on, and that the Mueller car had its glaring headlights burning, and that by reason of such glare *Clemens* was unable to see the Thomas car so as to avoid the happening of the collision.

The witnesses for the state further testified that when the *Clemens* car collided with the Thomas car it pushed it a distance of about thirty-five feet, and that the *Clemens* car ran an additional thirty-five feet before it was brought to a stop.   The witnesses for the plaintiff in error testified that the *Clemens* car pushed the Thomas car a distance of about twenty feet, while Hobart testified that when the

*Clemens* car was stopped it was about even with the Thomas car.

Upon this state of the evidence, there being a sharp conflict on these various disputes, it became a question for the jury to determine from all the evidence in the case, and from the surrounding facts and circumstances, as to which side was telling the truth, and which testimony it considered credible or otherwise, and which it would believe. The issues on the questions of fact thus presented having been submitted to the jury and having been found in favor of the state, the verdict cannot now, under the repeated decisions of this court, be disturbed. *Birmingham v. State,* 145 Wis. 90, 129 N. W. 670; *Van Haltren v. State,* 142 Wis. 143, 124 N. W. 1039; *Imperio v. State,* 153 Wis. 455, 141 N. W. 241.

Counsel for plaintiff in error, in their assignments of error, claimed:

1. That the court erred in its instructions to the jury on manslaughter in the fourth degree.

2. In refusing to grant the instructions requested by the plaintiff in error.

3. In refusing to grant the plea in bar of plaintiff in error.

4. In failing to set aside the verdict of the jury because it was contrary to law and the weight of the evidence.

5. In permitting the jury to return a verdict in the absence of plaintiff in error and his counsel.

The first four assignments can properly be considered together, as they involve the correctness of the charge of the court and the view that the court took in the matter with respect to what constitutes manslaughter in the fourth degree under our statutes.

The court instructed the jury in part as follows:

"That the defendant's act was committed by accident and misfortune and without any unlawful intent within the meaning of this statute is manifest. It remains, however, to determine whether the act involved, resulting in the death,

Clemens v. State, 176 Wis. 289.

was a lawful act, and, if it was lawful, whether it was done with usual and ordinary caution.

"The act of the defendant which is involved is the driving of the automobile when it struck the other automobile. If he was driving the automobile in violation of any provision of the statute regulating the driving of automobiles, and so driving resulted in the death, his act was not a lawful act.

"The statute regulating the use of automobiles provides, among other things, that no person shall drive an automobile on any highway at a speed in excess of thirty miles an hour; that where for any cause the view in the direction in which the automobile is proceeding shall be obstructed the speed shall be reduced to such a rate as will tend to avoid danger of accident; that from thirty minutes after sunset until thirty minutes before sunrise there shall be displayed on the front of every automobile while being driven on any highway at least one lamp giving a reasonably bright light in the direction in which the automobile is going; that it shall be unlawful for any person to drive an automobile on any highway at such a rate of speed that it cannot be brought to a complete stop within the distance ahead that the driver can with the aid of the lights thereon, in connection with the light from other sources, see an object the size of a person, and that no intoxicated person shall drive an automobile on any highway.

"If, therefore, the defendant was driving his automobile in excess of thirty miles an hour; or, if his view ahead was obstructed by darkness or by the glare from the headlights of the approaching car, and his speed was not reduced to such a rate as would tend to avoid danger of accident; or, if it was thirty minutes after sunset and he did not have a reasonably bright light on the front of his automobile; or, if he was driving at such a rate of speed that he could not bring his car to a full stop within the distance that he could see an object ahead of his car the size of a man; or, if the defendant was at the time intoxicated,—in any such event the defendant's act was unlawful, and he is guilty of manslaughter, if the violation caused the death.

"Should it not appear that the defendant was violating the statute regulating the use of automobiles, it does not necessarily follow that the homicide was excusable. If the

defendant was not violating this statute, but was not driving with usual and ordinary caution in other respects, and such want of care caused the death, the homicide was not excusable."

In this connection, in order to clearly present the contention of counsel for plaintiff in error with respect to the view taken by them as to the construction of the statutes involving manslaughter in the fourth degree, a few of their ·requested instructions may properly be set forth. Counsel for the plaintiff in error requested the court to instruct the jury, among other things, as follows:

"You are instructed that by the term 'criminal negligence,' as used in these instructions, is meant not simply such negligence as might be the foundation of a suit for damages by the person injured thereby, but something more than that. Negligence to become criminal must be reckless, wanton, and of such a character as shows an utter disregard of the safety of others under the circumstances, likely to cause injury.

"You are further instructed that unless you believe from all the evidence, beyond a reasonable doubt, that the defendant was guilty of criminal negligence, as defined in these instructions, and that Thomas was killed as the direct result of such criminal negligence, you should find the defendant not guilty."

There were other requested instructions upon the same subject, which, together with the requested instructions herein set forth, were refused by the court and not included in its instructions to the jury. Inasmuch as the other requested instructions not herein set forth were of a nature and import similar to the ones herein detailed, the same are herein omitted.

It therefore becomes evident that, in accordance with the views expressed by the trial court in its instructions, the failure to exercise ordinary care, if death results therefrom, warrants a conviction for manslaughter in the fourth degree. On the contrary, it was strenuously argued by coun-

sel for plaintiff in error, both on the oral argument and in their brief, that the degree of negligence contemplated by the provisions of the statutes on manslaughter in the fourth degree is not ordinary negligence but gross negligence. It may further be said that the evidence in this case, if it discloses negligence at all, refers to only such negligence as the plaintiff in error was guilty of in violating the provisions above set forth pertaining to the operation of automobiles upon the public highways of this state.

We consider the question involved a new one in this state, of far reaching importance to the citizens of the state, and have therefore carefully examined the law with respect to the contentions of both of the parties interested, and have arrived at the conclusion herein set forth after a painstaking review of the statutes, not only of this state but of other states, and the decisions applicable thereto construing such statutes.

Ordinary negligence, as defined by this court, consists of a want of that care and prudence that the great mass of mankind exercises under the same or similar circumstances. *Dahinden v. Milwaukee E. R. & L. Co.* 169 Wis. 1, 171 N. W. 669; *Astin v. C., M. & St. P. R. Co.* 143 Wis. 477, 128 N. W. 265.

It is held in *Jorgenson v. C. & N. W. R. Co.* 153 Wis. 108, 116, 140 N. W. 1088, that:

"Gross negligence has received a very certain and definite meaning in the jurisprudence of this state, somewhat different from the meaning given to it in other states. It is not inadvertence in any degree; there must be present either wilful intent to injure or that wanton and reckless disregard of the rights of others and the consequences of the act to himself as well as to others which the law deems equivalent to an intent to injure." *Willard v. C. & N. W. R. Co.* 150 Wis. 234, 136 N. W. 646.

The trial judge clearly defined his position in this case as to whether the negligence involved in the case con-

stituted ordinary or gross negligence, and made a statement in the record for that express purpose. Among other things he said:

"I think that the evidence shows, beyond a reasonable doubt, that at the time the defendant ran into the truck he was violating some provisions of the statutes regulating the use of automobiles. For instance, it seems very clear that he was driving without a reasonably bright headlight, and that he was driving so fast that he could not bring his car to a complete stop within the distance that he could see an object the size of a man ahead of his car, with the aid of his own headlights and such other light as was at the time present. These provisions were enacted for the protection of the public. They are criminal statutes. One who runs an automobile in conscious disregard of them, without intent to do injury or knowledge that any person is in a position of danger, is doubtless guilty of nothing more than ordinary negligence, as distinguished from gross negligence. There is, however, a degree of culpability not present when the negligence resulting in death is not a violation of any statute enacted for the public safety. But my view is that ordinary negligence, where no statutory safety regulation is violated, is clearly manslaughter in the fourth degree under our statutes."

Under the statement made by the learned trial judge the accident was not the result of gross negligence, and gross negligence was not involved in the case. The negligence that is referred to under the automobile statutes, and involving a violation of such statutes, according to the statement so made, is nothing more than ordinary negligence; but a distinction appears to be drawn between an act which involves a violation of these statutes and ordinary negligence which does not involve a violation of such statutes. Any form of ordinary negligence, where death results, according to the statement of the trial judge, is sufficient to warrant a conviction under the fourth-degree manslaughter statute of our state. By this, however, it was not intended by the trial court to convey the thought that a violation of

the statutes regulating the operation of automobiles upon the highways could not constitute gross negligence, for it can readily be seen that the driving of an automobile at a grossly excessive rate of speed, in violation of the statutes, may constitute an act so wanton and reckless as to evince an utter disregard for the safety of others and to necessarily imply an intent to injure.

A well defined distinction was therefore drawn by this court in *Ludke v. Burck,* 160 Wis. 440, 152 N. W. 190, between the case of *Pinoza v. Northern C. Co.* 152 Wis. 473, 140 N. W. 84, and the *Ludke Case.* In the *Pinoza Case* it was expressly held that where a violation of a statute designed to protect persons against bodily injuries is made a criminal offense, such a violation should be classed with gross negligence. It is said in the *Ludke Case,* referring to the statutes involved in the *Pinoza Case,* that

"These cases dealt with statutes prohibiting the sale of firearms and the employment of minors under sixteen years of age in certain specified employments. The doctrine of these and similar cases is that the violation of these statutes is of such gravity that public policy requires, in the interest of protecting life and limb, that persons violating them be held to strict accountability for the consequences flowing therefrom, regardless of the fault of the injured person, and therefore the persons violating them and thereby producing personal injuries to another were to be treated as guilty of wilfully injuring another as a matter of law."

In the *Ludke Case* the Chief Justice in his opinion raises the question as to whether the doctrine laid down in the *Pinoza Case* applies to cases where statutes prohibit something innocent in itself but made unlawful, and violation thereof penalized to compel a higher standard of care as regards persons and property. In the opinion last referred to, a violation of the automobile statutes is placed in the latter category.

It was not held in the *Ludke Case* that a violation of the automobile statutes may not be of such a nature as to con-

stitute gross negligence, but it was held in substance that such violation may amount to mere inadvertence or to gross negligence, depending upon the facts in the particular case. It was also held that a violation of a statute like the automobile statute was negligence *per se,* but not necessarily actionable negligence.   As a conclusion in the *Ludke Case* the court holds that the issue raised as to whether the act constitutes ordinary or gross negligence presents a proper issue for the jury to determine upon the evidence, facts, and circumstances disclosed in the case.

We now come to an examination of the statutes pertaining to manslaughter applicable to the instant case.   Sec. 4337 of the Statutes provides:

"The killing of a human being, without the authority of law, by poison, shooting, stabbing or any other means or in any other manner is either murder, manslaughter or excusable or justifiable homicide, according to the facts and circumstances of each case."

Sec. 4365 of the Statutes provides:

"The killing of a human being by the act, procurement or omission of another in cases where such killing shall not be murder according to the provisions of this chapter is either justifiable or excusable homicide or manslaughter."

Sec. 4363 of the Statutes provides:

"Every other killing of a human being by the act, procurement or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder or manslaughter of some other degree, shall be deemed manslaughter in the fourth degree."

Sec. 4367 of the Statutes provides:

"Such homicide is excusable when committed by accident and misfortune in lawfully correcting a child or servant, or in doing any other lawful act by lawful means with usual and ordinary caution and without any unlawful intent," etc.

In no event could the act complained of be considered as

justifiable homicide, and such was conceded on the trial by counsel for plaintiff in error. Therefore, the matter resolves itself to a determination as to whether or not it was excusable homicide. It was held by the trial court that the act committed was the result of accident and misfortune, and that the act in itself was a lawful act and was committed without any unlawful intent. With such conclusion of the trial court we readily agree.

There is, therefore, then presented to us for determination the question whether or not the act was committed with usual and ordinary caution. As already stated, the elements of usual and ordinary caution in the performance of an act are essential constituents involved in the definition of ordinary care, and under such definition the failure to perform such lawful act with usual and ordinary care as the great mass of mankind exercises under the same or similar circumstances constitutes negligence.

The fourth-degree manslaughter statute applicable to this case embraces in its provision every killing of a human being by the act, procurement, or culpable negligence of another where such killing is not justifiable or excusable or is not declared to be murder or manslaughter of some other degree. A correct interpretation of this statute, therefore, involves primarily the intention of the legislature in the use of the word "culpable" negligence therein, it being contended by counsel for the plaintiff in error that such term necessarily implies gross negligence as above defined, while counsel for the state insist that such term as so used in this statute implies and means nothing further than ordinary negligence as herein defined.

" 'Culpable negligence' is the omission to do something which a reasonable, prudent, and honest man would do, or the doing of something which such a man would not do, under the circumstances surrounding the particular case." *Newman v. Luther,* 119 App. Div. 701, 703, 104 N. Y. Supp. 684, 685 (quoting and adopting definition in 2 Words & Phrases, 1780).

See, also, *Hot Springs R. Co. v. Newman,* 36 Ark. 607, 611; *Sikes v. Sheldon,* 58 Iowa, 744, 13 N. W. 53, 54; *St. Louis, I. M. & S. R. Co. v. Bragg,* 66 Ark. 248, 50 S. W. 273, 274; *Woodman v. Nottingham,* 49 N. H. 387, 392, 6 Am. Rep. 526; *People v. Buddensieck,* 4 N. Y. Crim. Rep. 230, 1 N. Y. St. Rep. 436, affirmed 103 N. Y. 487, 9 N. E. 44; *Montgomery v. Scott,* 10 S. C. 449, 451; *State v. Emery,* 78 Mo. 77, 80; *State v. Horner,* 266 Mo. 109, 180 S. W. 873.

In *Johnson v. State,* 129 Wis. 146, 157, 108 N. W. 55, Mr. Justice MARSHALL, in rendering the opinion of the court, said that:

"Manslaughter in the third degree is defined as the killing of a human being in the heat of passion without a design to effect death, etc., while manslaughter in the fourth degree is defined to be an involuntary killing of a human being in the heat of passion, etc. The term 'involuntary' signifies inadvertence."

We therefore have authority in this state that the statute pertaining to manslaughter in the fourth degree is held to be an involuntary killing, and that the term "involuntary" signifies inadvertence. "Inadvertence," as defined in Webster's dictionary, means "Lack of heedfulness or attentiveness; inattention; negligence."

Both the *Johnson Case* and the definition referred to clearly indicate that the trial court was right in his statement that one can be held for manslaughter in the fourth degree even though the killing is involuntary and is due to inadvertence.

In the case of *Bliss v. State,* 117 Wis. 596, 94 N. W. 325, where the death was the result of an explosion of a lighted kerosene lamp, which explosion, the state contended, was caused by the act of the plaintiff in error, and in which it was contended by the plaintiff in error that the deceased was in the act of throwing at him such lighted kerosene lamp, and where the plaintiff in error claimed that he accidentally

struck the lamp while throwing up his hands, under the supposition that the deceased was about to strike him with it, the court held that, if the contention of the plaintiff in error was correct, then such contention constituted an adequate defense to the action; but that if, as a matter of fact, the plaintiff in error in raising his cane was not justified in supposing that the deceased was about to throw at him such lighted kerosene lamp, then he was guilty of manslaughter in the fourth degree. It would appear that no more apt case illustrating the doctrines contended for herein by the state could be produced in justification of their contentions, for it becomes clear that if in the *Bliss Case* the plaintiff in error could be convicted of manslaughter in the fourth degree by the doing of an act which appeared to him at the time necessary for his own protection, but which act as a matter of fact was not justifiable for the reason that he was mistaken as to what appeared to him as an act of violence on the part of the deceased towards him, then the proper statute applicable to the offense of which he was guilty is manslaughter in the. fourth degree. Such act, under the construction of the court in the *Bliss Case,* was nothing more than inadvertence or negligence.

In Missouri there is but one degree of manslaughter, which, under the provisions of sec. 3236 of the statutes of that state, is defined as follows:

"Sec. 3236. *Manslaughter.* Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter."

The Missouri statute is therefore almost *verbatim* like the fourth-degree manslaughter statute of the state of Wisconsin.

Excusable homicide under the Missouri statute, as defined by sec. 3234 of the statutes of that state, is as follows:

"Sec. 3234. *Excusable homicide.* Homicide shall be deemed excusable when committed by accident or misfor-

tune, in either of the following cases: First, in lawfully correcting a child, apprentice or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent," etc.

The Missouri statute on excusable homicide, therefore, is also almost *verbatim* like the Wisconsin statute upon the same subject.

In *State v. Horner,* 266 Mo. 109, 180 S. W. 873, in which the defendant was charged with manslaughter, based upon the culpable negligence of defendant in operating an automobile over the public streets of the city of St. Louis in such a manner as to run down and kill one Cooper, the court in its opinion says:

"The instructions given by the court to the jury defined the term 'culpable negligence' as the failure to exercise the 'highest degree of care which a very prudent and ordinary skilful driver of an automobile would have used under the same or similar circumstances.' "

The supreme court of Missouri in its decision held such instruction clearly erroneous, and said:

"It is true that the act of 1911 (Laws 1911, pp. 330, 331) makes the 'owner, operator or person in control of an automobile' respond in civil damages for any injury resulting from the failure to use 'the highest degree of care' as by said act defined, but said act has reference only to civil actions, and is in no sense to be considered a part of the criminal code, and, therefore, has no part in fixing the standard of care required in measuring criminal responsibility."

The term "culpable negligence," as used in the statute of Missouri as above stated, was defined by the supreme court of Missouri as follows:

"Culpable negligence is the omission to do something which a reasonable, prudent, and honest man would do, or the doing something which such a man would not do under all the circumstances surrounding each particular case." *State v. Emery,* 78 Mo. 77; Wharton, Homicide (3d ed.) § 445; 3 Greenleaf, Evidence (16th ed.) § 129; Kelley,

Criminal Law & Prac. (3d ed.) § 511, p. 454; *State v. Coulter* (Mo.) 204 S. W. 5.

It was also held in *State v. Becker,* 9 Houst. (Del.) 411, 33 Atl. 178, that, if there be any negligence, or want of proper care, in the action of a person from which death results, the death cannot be said to be purely accidental; it is the consequence of such negligence or want of proper care, and criminal liability attaches. *State v. Morgan,* 40 S. C. 345, 18 S. E. 937; *Bertrong v. State,* 2 Tex. App. 160.

In Michigan, Connecticut, and Illinois, and in other states where a different rule prevails than in Missouri, the common law obtains with respect to the crime of manslaughter, or statutes have been enacted which substantially and materially differ in their wording from the statutes of either Missouri or Wisconsin, and therefore the doctrine requiring a degree of culpability amounting to criminal negligence has been declared in those states. In Ohio, in order to convict of manslaughter, the act must be an unlawful act, which has been construed by the supreme court of Ohio as being one in violation of some penal statute, as it was declared by that court that the common law is not applicable in such state.

There is no escape, therefore, from the view that the trial court in this case presented in its instructions, and we are therefore necessarily constrained to adopt such view.

In examining the automobile statutes applicable to the case at bar we find that counsel on both sides of the case and the trial court were under the impression that the Statutes of 1917 were in force and applicable to the case, whereas at the time the accident happened the Statutes of 1919 had been adopted and published and were in full force and effect. As to the speed-rule limit outside of incorporated cities and villages in this state, the maximum speed was properly set forth in the instructions in accordance with the 1919 Statutes.

Sec. 1636—52a of the 1919 Statutes provides:

"1. From thirty minutes after sunset until thirty minutes before sunrise, no automobile, motorcycle or other similar motor vehicle shall be driven upon or occupy any public highway in this state unless such vehicle is provided with sufficient lights, of such design and so adjusted and operated as to render the use of the highway by such vehicle safe for all the public.

"2. The minimum requirements for head lamps on any automobile or other similar motor vehicle except motorcycles, while being driven upon the highway, shall be such as to enable the driver to clearly distinguish a person, vehicle or other substantial object two hundred feet ahead, and the design, adjustment and operation of such head lamps shall be such as to avoid dangerous glare or dazzle."

Sec. 1636—52 of the 1917 Statutes, under which the trial court in part instructed the jury, provides:

"From thirty minutes after sunset until thirty minutes before sunrise there shall be displayed on the front of every automobile or other similar motor vehicle, while being operated or driven along or upon any public highway of this state, at least one lamp giving a reasonably bright light in the direction in which said automobile or other similar motor vehicle is going, . . . and it shall be unlawful for any person to operate or drive any automobile, . . . along or upon any public highway of this state at such a rate of speed that such automobile, motorcycle or other similar motor vehicle cannot be brought to a complete stop within the distance ahead that the driver or operator thereof can, with the aid of the lights thereon, in connection with the lights from other sources, see an object the size of a person."

An examination of these two statutes makes it manifest that under the 1917 Statutes it shall be unlawful for any person to operate or drive any automobile, etc., along or upon any public highway of this state at such a rate of speed that such automobile, etc., cannot be brought to a complete stop within the distance ahead that the driver or

operator thereof can, with the aid of the lights thereon, in connection with the lights from other sources, see an object the size of a person; while in the Statutes of 1919 the operator must provide his automobile with sufficient lights, of such design, etc., as to render the use of the highway by such vehicle safe for all the public, such lights to be of such a design as to enable the driver to clearly distinguish a person, vehicle, or other substantial object 200 feet ahead.

A careful reading of these two sets of statutes on the subject of lights also, as it appears to us, makes it clear that the 1919 Statutes are not more favorable to plaintiff in error than the Statutes of 1917, and under both statutes the operator of an automobile is required to so operate his machine as to avoid danger and injury to persons upon the highway.

No exceptions, however, to the instructions of the trial court with respect to differences in the 1917 and 1919 Statutes having been taken and incorporated in the record, and not being a part of the bill of exceptions, and no error having been based upon the failure of the court to properly instruct in that regard, and no proper instructions in that respect having been requested by the plaintiff in error or his counsel, we do not feel it incumbent, under the circumstances of the case, to consider seriously the mistake that was so made. Being required to operate his machine on the public highway, by the provisions of the Statutes of 1919, at such a rate of speed as to avoid danger of injury, and the plaintiff in error having admitted that he had a headlight upon his machine which threw a light ahead not to exceed forty feet, and it appearing also to us clearly that the plaintiff in error did not operate his machine, under the existing circumstances, so as to avoid injury, we cannot see how we can disturb the verdict.

We are not aware of any previous prosecution in this state under the fourth-degree manslaughter statute where a defendant was proceeded against upon a charge of man-.

slaughter where death resulted from the performance of a lawful act by lawful means but not with usual and ordinary care; on the contrary, we are of the opinion that the doctrine was quite generally accepted by the courts and the profession that the term "culpable negligence," as used in the statute under consideration, involved something more than the elements of ordinary negligence. The wording of the statute, however, is plain and unambiguous, and we must therefore interpret such meaning in the light of the clear language used.

It must also be apparent to every one who has given the subject any thought that the interpretation contended for by the state has been directed to our attention by reason of the numerous deaths which have resulted from a violation of the provisions of the statutes pertaining to the operation of automobiles upon the public highways. In the instant case the trial judge in effect pronounced the manslaughter statute in question, as interpreted by him, a reasonable statute, and one which, if enforced, will have a tendency in a large measure to reduce the numerous injuries inflicted by the use of the automobile. This conclusion of the trial judge may be deemed correct by some and incorrect by others.

Our commercial and industrial life has, since the adoption of these statutes, become so complex and intricate that it has engaged and is engaging our mental efforts in an ever-increasing degree; in other words, our minds are absorbed with the great problems that confront us in the pursuit of the avocations which we have chosen for a livelihood. This fact in itself is largely responsible, as we view it, for the numerous injuries that result from inadvertence. The automobile itself is a complex and intricate piece of mechanism. The machinery and appliances used in industry have changed their nature from the simple and primitive form which existed at the time of the adoption of these statutes. In almost every avenue of life danger to life and

Clemens v. State, 176 Wis. 289.

injury to limb stares us in the face.  The ownership and use of automobiles has increased during the period of twenty years incredibly, and the ownership of such an instrumentality is no longer considered as a luxury but as a necessity.  Automobiles are no longer exclusively used for pleasure, but have become a necessity in business.  Automotive power competes today with the public utilities like the street cars and the railroads, both in the carrying of passengers and freight.  It is estimated that one out of every ten of the inhabitants of this state is the owner of an automobile, and what was predicted less than a quarter of a century ago, that automobiles would supplant the use of the horse in the operation of vehicles, is now a well-known reality.  These facts have received proper recognition by the state and the local communities, and as the result thereof modern and improved highways have been built in all portions thereof, and extending from one end of the state to the other, all designed to accommodate the new order of things.  In large cities, where the population is congested, thousands and thousands of automobiles travel at a rapid rate of speed along the highways and the thoroughfares; and on the main arteries of travel in the country, and particularly on such highways as connect large urban populations, a similar situation exists.  The motor vehicle in itself is a powerful engine, propelled upon the highways of the state where people have a right to and do travel, and the operation thereof must necessarily be connected with great danger.

And so, in the course of time, there has developed a situation which has resulted in an appalling loss of human life and great injury to limb.  Such results, however, are the natural and, to a large extent, inevitable consequences of the use to which these instrumentalities are put.  We are inclined to view the situation too much from the standpoint of the pessimist and to overlook the really bright sides of the matter, which to a large extent counterbalance the dark

sides and act as a compensating influence for the necessary evils which result. The busy lawyer, under the law as we have now construed it, whose mind during the day has been absorbed in the consideration of the intricate problems that have been presented to him in the course of his professional activities during the day, and who by reason thereof is unable wholly to relieve himself of his absorbing thoughts, who, in an effort to regain a well-deserved relaxation at the end of his day's labor, in taking out his family for an automobile ride, exceeds the prescribed speed limit in the slightest degree, and as the result thereof a collision takes place which unfortunately causes the death of a human being, will be subject to a homicidal charge and a conviction thereof, which not only will be ruinous to his own happiness and welfare, but reflect seriously upon the members of his family. The laborer employed in the construction of a large building, who while absorbed in the performance of his duties, or whose mind may incidentally be engaged in pondering over serious matters of domestic trouble and difficulty, inadvertently may drop some tool or an article of building material, as the result of which a human life may be lost. The result is that he has changed his status from a law-abiding citizen to that of a felon, and if he be endowed with the conscientious regard and appreciation which all good citizens should possess, namely, that of retaining his good name and reputation in the community where he resides, he must be keenly affected by the results wrought and the consequence of what can be termed nothing more than his misfortune. While the freedom from physical injury and the full possession of our physical and mental powers are most desirable, and while life itself is one of the dearest possessions with which man is blessed, the true citizen esteems his good name and his reputation of infinitely greater importance than either life or limb.

We have indulged in these comments merely to make it clear that we are not heartily in accord with the purport of

the manslaughter statute in question, with the thought that at the earliest time available such changes be made in the statutes of our state by the legislature as will require, in order to convict of manslaughter in the fourth degree, gross negligence as defined in the decisions of this court, or that provision be made so that no one will come within the condemnation of this statute unless he is guilty of an act in violation of some penal law, as the result whereof human life is taken.

However, we must construe the statutes before us in the light of their clear import and meaning; and we have done so.

Counsel for the plaintiff in error contend that the court erred in permitting the jury to return the verdict in the absence of the plaintiff in error and his counsel. It has been repeatedly held that a verdict should not be received in the absence of the accused and his counsel unless the right of accused to be present in person and to have counsel present is waived.

At the time the jury retired the accused and his counsel were informed by the trial judge that in case the jury reached a verdict before 9 or 10 o'clock that evening he would be in attendance to receive it. Upon the jurors' announcing to the court their readiness to return a verdict the deputy sheriff telephoned to the office of counsel for the accused and left word that the jury was ready to return its verdict and that the verdict would be shortly received, and that if the accused and his counsel wished to be present it would be necessary for them to immediately come over to the court room. This was at approximately 8:45 p. m. It appears from the affidavits that the office of the attorneys for the accused was but a few blocks distant from the court room. The court waited about fifteen minutes for counsel and the accused to appear, and, not having appeared, the verdict was received. Both the accused and his counsel were vitally interested in this verdict, and both

had received due notice of the agreement of the jury and the readiness of the court to receive the verdict. It would be unfair, under the circumstances, to expect the court to wait an unreasonable length of time. Both the accused and counsel absented themselves voluntarily, and we are therefore of the opinion that the right of the accused and his counsel to be present at the time of the reception of the verdict and the right to poll the jury, under the decisions of this court in *Stoddard v. State,* 132 Wis. 520, 112 N. W. 453, and *Hill v. State,* 17 Wis. 675, was waived.

The judgment and sentence of the lower court is therefore affirmed.

*By the Court.*—Judgment affirmed.


A motion for a rehearing was denied, without costs, on March 14, 1922.