Jorgenson, Administrator, Respondent, vs. Chicago & Northwestern Railway Company, Appellant.

*March 12—April 8, 1913.*

*Railroads: Grade crossings: Safeguards: Speed of trains: Statutes: Construction: "Gates:" "Electric bell:" Injury to person: Contributory negligence: "Gross negligence:" Proximate cause.*

1. The grade-crossing statute (sec. 1809, Stats.), though drastic in its provisions, is a statute *in favorem vitæ*, and in construing it, if there be room for two meanings, the courts should give to it such meaning as will result in the accomplishment of the legislative purpose, rather than a meaning that will tend to defeat that purpose.

2. The term "gates," as used in that statute, means, not a single gate, but gates upon both sides of the track, and to constitute a compliance with the act, where a railway company adopts gates as a safeguard, both must be maintained and operated.

3. If a gate becomes temporarily out of commission and its repair requires the services of an expert workman not immediately at hand, the statute can be satisfied by the placing of a flagman at the crossing for the time being, or the speed of trains can be temporarily reduced to meet the new situation, and it is the duty of the railway company to adopt one or the other of these courses.

4. The running of trains by a railway company at a speed exceeding twelve miles per hour over a grade street crossing in a city, at a time when the prescribed safeguards are not maintained, is a violation of the statute and an "omission" to comply with its requirements, and in an action for personal injuries caused thereby no want of care on the part of the person injured, less than gross negligence, will bar a recovery.

5. The requirement in the statute of "an efficient electric alarm bell or signal properly installed and in good working order" refers clearly to the well-known appliance in common use at railroad crossings, namely, a bell or gong arranged with electric wires so as to ring automatically and continuously so long as a car or engine is on the crossing or within a given distance of it; and a tower bell rung by hand is not a compliance therewith.

6. The term "gross negligence," incorporated into said sec. 1809 by ch. 653, Laws of 1911, had, before that law was passed, received a very certain and definite meaning in the jurisprudence of this state, excluding mere inadvertence in any degree; and it must be conclusively presumed that the legislature knew of such meaning and used the words deliberately, intending to give them their established legal significance.

7. As there used, gross negligence would cover not merely a suicidal act, but any entry by a person upon the crossing with a reckless disregard of the consequences, not caring what result might happen to him or to the occupants of the train.

8. Plaintiff's intestate, on his way to his work, approached a double-track crossing with which he was familiar and which had been for many years protected by gates, and found it occupied by an engine and cars engaged in switching, with the nearer gate down. Passing by the gate and around the rear of the switch engine which still obstructed the walk, he was seen to look up the track, but the jury found that his view was obstructed by smoke and steam from the engine. The gate on the opposite side was up and he proceeded to cross at an ordinary walk and was about over the last rail of the further track when struck by a passing train. *Held*, that he was not guilty of gross negligence as a matter of law.

9. Evidence showing the facts above stated is *held* to sustain a finding by the jury that the speed of the train, exceeding twelve miles per hour, was the proximate cause of the death.

BARNES and MARSHALL, JJ., dissent.

APPEAL from a judgment of the municipal court of Racine county: WILLIAM SMIEDING, JR., Judge. *Affirmed.*

The plaintiff's intestate was killed by a train while crossing the defendant's tracks at the State street crossing in the city of Racine. The evidence showed the following state of facts: State street runs east and west and crosses the tracks of the defendant at grade and practically at a right angle just

north of the defendant's passenger station in Racine. It is a very busy street, and the crossing is furnished with gates operated from a tower; a bell is also located in the tower, which is continuously sounded by the tower man when the gates are down. There is a double track at this point, the east track being used by south-bound trains and the west track by north-bound trains. At 11 o'clock of the night before the accident the east gates refused to operate because of the freezing up of some of the air pipes or conduits by which they were controlled from the tower. This condition remained until after the accident, and the east gates remained standing up during the whole time. At about 8:30 a. m. of March 8, 1912, the deceased, a carpenter by occupation, familiar with the crossing, approached the crossing from the west, walking on the north sidewalk of the street. The tower bell was ringing as he approached. The west gates, which covered the roadway of the street, were down. There is testimony tending to show that the north arm of the west gates, which normally extended horizontally across the north sidewalk of the street, stood at an angle of forty-five degrees, but this is disputed by the defendant's witnesses, and also claimed to be mechanically impossible. As the deceased came to the gates, switching was being done on the west track; an engine headed north with its bell ringing was slowly pushing a string of ten or eleven freight cars northward. The deceased passed under the north gate, and, as the switch engine passed northward, he stepped out into the street and around the south end of the tender, and into the eight-foot space between the northbound and south-bound tracks. The testimony tends to show that considerable smoke and steam escaped from the switch engine and obscured the vision immediately north and northeast of the deceased at this time. He proceeded eastward without stopping, and just as he was about to clear the east rail of the east (or south-bound) track a passenger train from the north, due at about that time, struck him, causing instant death.

The following special verdict was returned by the jury:

"(1) Was the defendant guilty of any want of ordinary care in failing to properly maintain and operate the gates, or provide some equivalent safeguard, at the crossing in question, at the time said deceased was struck by defendant's engine? A. Yes.

"(2) If you answer question number 1 'Yes,' then was such want of ordinary care the proximate cause of the death of said deceased? A. Yes.

"(3) Did the engine and train which struck and killed deceased, approach and cross State street at a rate of speed exceeding twelve miles an hour? A. Yes.

"(4) Was the defendant guilty of a want of ordinary care in running said train at said rate of speed, at that time and place, under the circumstances? A. Yes.

"(5) If you answer question number 4 'Yes,' then was such want of ordinary care the proximate cause of the death of said deceased? A. Yes.

"(6) Was deceased's view of the approaching south-bound train obstructed by smoke and steam from the switch engine, as he passed towards the east from behind said engine? A. Yes.

"(7) Was the deceased guilty of gross negligence in attempting to cross said tracks, under the circumstances? A. No.

"(8) What sum of money will compensate the person or persons entitled thereto for the death of Nels C. Jorgenson? A. $3,500."

From judgment for the plaintiff upon this verdict the defendant appeals.

*Edward M. Smart,* for the appellant, cited, *inter alia, Lake Shore & M. S. R. Co. v. Ehlert,* 63 Ohio St. 320, 58 N. E. 812; *Debbins v. O. C. R. Co.* 154 Mass. 402, 28 N. E. 274; *Marden v. B. & A. R. Co.* 159 Mass. 395, 34 N. E. 404; *Cleary v. P. & R. R. Co.* 140 Pa. St. 19, 21 Atl. 242; *Sheehan v. P. & R. R. Co.* 166 Pa. St. 354, 31 Atl. 120; *Ludolf v. C. & N. W. R. Co.* 116 Ill. App. 239; *Theobald v. C., M. & St. P. R. Co.* 75 Ill. App. 208; *Koester v. C. & N. W. R. Co.* 106 Wis. 460, 82 N. W. 295; *Haetsch v. C. & N. W.*

*R. Co.* 87 Wis. 304, 82 N. W. 295; *Groesbeck v. C., M. & St. P. R. Co.* 93 Wis. 505, 67 N. W. 1120; *Emery v. B. & M. R. Co.* 173 Mass. 136, 53 N. E. 278; *Douglas v. C., M. & St. P. R. Co.* 100 Wis. 405, 76 N. W. 356; *Holdridge v. Mendenhall,* 108 Wis. 1, 83 N. W. 1109; *Coel v. Green Bay T. Co.* 147 Wis. 229, 133 N. W. 23.

*Wallace Ingalls,* attorney, and *John B. Simmons,* of counsel, for the respondent.

WINSLOW, C. J.    By sec. 1809 of the Statutes the legislature has endeavored by various imperative requirements to eliminate as far as possible the dangers of the grade crossing.

Sub. 1 of this section prohibits the running of a train or locomotive in any incorporated city or village faster than twelve miles per hour while approaching and within twenty rods of any grade street crossing. Sub. 2 provides that whenever a railroad company "shall erect, maintain and operate" gates, or "maintain a flagman" at any such grade crossing, a train or locomotive may be run at a speed not exceeding thirty miles an hour, and if it shall maintain "an efficient electric bell or signal properly installed and kept in good working order," at a speed not exceeding twenty miles an hour, while approaching and within twenty rods of and while crossing such grade crossing. Sub. 3 provides for the ringing of the engine bell continuously while approaching such crossings, except where gates or flagmen are maintained. Sub. 4 provides for the blowing of the whistle and the continuous ringing of the engine bell as the engine approaches a country grade crossing. Sub. 5 requires the erection and maintenance of signs at all highway crossings, and sub. 6 provides that in any action brought to recover for personal injuries or death, if it appears that such injuries or death was caused by the "omission" of a railroad company to comply with any of the requirements of the section, the fact that the person injured or killed was guilty of any want of ordinary

care contributing to the injury or death shall not bar a re-
covery, and no want of care on the part of the person injured
or killed, "less than gross negligence," shall bar such recov-
ery.

In the present case it was found upon sufficient evidence
that the train which struck and killed the deceased ap-
proached and crossed State street at a speed exceeding twelve
miles an hour; hence, unless the defendant company main-
tained either gates, a flagman, or an electric bell or signal at
the crossing, there was clearly a violation of the statute by
the railroad company in this instance, which, if it proxi-
mately caused the death of Jorgenson, renders the railroad
company liable therefor in the absence of gross negligence on
his part.

It is argued by the appellant (1) that, as to a foot pas-
senger approaching from the west, the gates were maintained
within the meaning of the law if the west gates were operated,
even though the east gates were out of commission; (2) that
"maintain and operate" gates does not mean to keep in per-
fect condition every minute whatever happens, but must be
reasonably construed as meaning only a duty to keep them
in a state of repair, i. e. to put competent operators in charge,
employ competent repair men, and use reasonable diligence
to keep the same in continuous operation; (3) that neither
the failure to have the east gate down nor the maintaining
of a speed exceeding twelve miles an hour, in the absence of
gates or a bell, can be held to be an omission to "comply with
the requirements" of the statute.

We are not disposed to adopt any narrow or restricted view
of the requirements of this statute. It is said to be a drastic
statute, and there is more or less truth in the statement. It
is also, however, a statute *in favorem vitæ*. The legislature,
in view of the appalling frequency of grade-crossing acci-
dents, deemed it best to safeguard the public by requiring
careful and somewhat burdensome precautions to be taken by

railroad companies, especially as to city crossings. The wisdom or exact justice of these requirements is not for the courts to determine or criticise. So long as no positive constitutional right is infringed upon, the legislature has full power to prescribe the means by which the grade-crossing danger is to be obviated or lessened. The duty of the courts is to give effect to the legislative intention, if the intention be clear; to give the law such meaning (if there be room for two meanings) as will result in the accomplishment of the legislative purpose, rather than a meaning that will tend to defeat the purpose.

We can give no such restricted meaning to the statute before us as counsel for defendant claim should be given to it. Its words are specific and clear. The railroad company is relieved of the twelve-mile restriction when it "shall erect, *maintain* and *operate*" the gates, not when it shall erect and keep them in repair, or exercise due care to operate them. It is not necessary now to decide what conclusion we might reach in a case where the apparatus was suddenly wrecked by accident and, before opportunity for repair, a passenger was killed or injured on the crossing by reason of the absence of the gates. That case is not here. In the present case the east gate had been out of commission for more than nine hours at a crossing in a populous city where 150 trains a day cross the street. If the repair of the gates required the services of an expert workman not immediately at hand, the statute could have been satisfied by the placing of a flagman at the crossing for the time being, or the speed of trains could have been temporarily reduced to meet the new situation, and we hold that it was the duty of the defendant to adopt one or the other of these two courses. As to the contention that the statute is satisfied so far as an east-bound passenger is concerned, if the west gate alone be operated, the same general propositions apply. It is plain that there might well be cases where the failure to operate the gates upon one side of the crossing

might easily operate as a trap to the unwary traveler, especially if he had been accustomed to see both sides operated simultaneously. The statute contains no intimation that its terms will be satisfied as to any person by the operation of one gate. It requires not only the erection of *gates* (meaning unquestionably a gate on each side), but the maintenance and operation of *gates* as well. If two gates are to be erected, two gates are to be operated.

We have not been able to appreciate the argument made under the third head above referred to, and will simply say that we are unable to agree with it.

We reach the conclusion, therefore, that under the undisputed evidence gates were not maintained at this crossing at the time of the accident in question.

Was there an "efficient electric alarm bell or signal properly installed and kept in good working order" at this crossing at the time of the accident? Plainly this question must be answered in the negative on the undisputed evidence. The legislature evidently had in mind a known, common appliance with which every one who does any considerable amount of traveling by rail is familiar, namely, a bell or gong arranged with electric wires, so as to ring automatically and continuously so long as a car or engine is on the crossing or within a given distance of the crossing on either side. It is not for any person to say that a bell operated by hand and rung continuously during the same time answers every purpose of the law, and hence ought to be considered as satisfying the statutes. *Ita lex scripta est.* Only by compliance with the law as written is a speed exceeding twelve miles an hour permitted. In the present case there has been no compliance with the law as written, either with respect to the gates or the bell.

It is argued that the deceased was guilty of gross negligence as matter of law, and hence that the court should have changed the answer to the seventh question and rendered judg-

ment for the defendant. We cannot so hold. The provision exempting the injured party from the legal consequences of all contributory negligence less than gross negligence first appears in ch. 653 of the Laws of 1911, and takes the place of a clause contained in ch. 332 of the Laws of 1909, which was milder in its terms, and provided only that a slight want of ordinary care contributing to the injury or death should not bar a recovery. Gross negligence has received a very certain and definite meaning in the jurisprudence of this state, somewhat different from the meaning given to it in other states. It is not inadvertence in any degree; there must be present either wilful intent to injure or that wanton and reckless disregard of the rights of others and the consequences of the act to himself as well as to others which the law deems equivalent to an intent to injure. *Willard v. C. & N. W. R. Co.* 150 Wis. 234, 136 N. W. 646, and cases there cited.

That meaning has been so thoroughly intrenched and established here that it must be conclusively presumed that the legislature knew of such meaning, and used the words deliberately intending to give them their established legal significance. The words do not seem to be very happily applied to situations where the first and perhaps the only serious result of the act under consideration will probably be the death of the actor himself or his serious injury; still, gross negligence under its accepted definition here would cover not merely a suicidal act, but any entry on the crossing with a reckless disregard of the consequences, not caring what result might happen to himself or to the innocent occupants of a train. It is by no means infrequent that a man partially intoxicated drives his horses over a grade crossing in utter and reckless disregard of consequences, thereby wantonly endangering not only his own life, but the lives of many others.

We find ourselves unable to say as matter of law that the deceased in the present case was guilty of gross negligence as the term is understood in Wisconsin. True, the proof showed

that he entered on the right of way when the gates were down and the tower bell ringing and attempted to cross the east track when his vision to the north was obscured by smoke and steam. This unquestionably constitutes a high degree of negligence strictly so called. In states like Massachusetts, where the difference between negligence and gross negligence is simply a difference in degree, it might perhaps be said that gross negligence was proven here as matter of law (*Debbins v. Old Colony R. Co.* 154 Mass. 402, 28 N. E. 274), but with our standard of gross negligence, a standard which rejects inadvertence and inattention entirely, we cannot so hold. The question was for the jury.

The question whether any omission or omissions to comply with any of the requirements of sec. 1809 can properly be held to have proximately caused the death of Jorgenson still remains to be considered.

The first requirement is that no train or locomotive shall approach a grade crossing in any incorporated city or village at a greater speed than twelve miles an hour, *provided,* however, that if the company maintain gates or a flagman a speed of not exceeding thirty miles an hour may be lawfully used, and in default of these, if it maintain an electric bell, a speed of not exceeding twenty miles an hour may be lawfully used. These provisos are not requirements perhaps in the strictest sense. No railroad company is required by the law to maintain flagman, gates, or bell (except as it may be said that the third subdivision requires the company to comply with local municipal regulations in this regard); but if the railroad company wishes to operate its trains at a greater speed than twelve miles an hour while approaching such grade crossings, *it is required* to maintain and operate one or the other of these safety devices. In this sense these provisions are requirements. The defendant here chose to install and attempt to maintain gates, and thus be allowed to run its trains at a speed exceeding twelve miles an hour. If, after installing

the gates, it failed to maintain them or to provide the electric bell, it violated the law when it ran its trains at a speed exceeding twelve miles an hour during the time that these safeguards were not maintained. We have already held that the defendant did fail to maintain the gates, and there is no proof that it maintained a flagman or an electric bell; so it is an undisputed fact under the evidence that it failed or omitted to comply with the requirement of the law when it ran the train in question over the State street crossing at a speed exceeding twelve miles an hour. The jury have found that the running of the train at that rate of speed was a proximate cause of the injury. If this finding has sufficient support in the evidence, no reason is perceived why judgment for the plaintiff does not necessarily follow.

It is argued that the excessive speed of the train cannot properly be held to be the proximate cause of the accident because the deceased would have met with the same disastrous results had he stepped in front of a train going twelve miles an hour, and the doctrine of the case of *Holdridge v. Mendenhall,* 108 Wis. 1, 83 N. W. 1109, and the Pennsylvania cases therein cited, is relied upon as authority for the position. All these cases are cases where a child, without looking, ran against or immediately in front of a moving street car in plain sight, and it was apparent that whatever the speed of the car was it bore no proximate causal relation to the accident. This proximate causal relation must exist if there is to be a legal liability based upon excessive speed. Whether it does exist or not will necessarily depend on the surrounding circumstances in each case.

In the present case the crossing was a much used crossing in a populous city. It is in evidence that as the deceased emerged from behind the switch engine and while he was crossing over the eight-foot space between the west and east tracks he looked both north and south. It is also in evidence that considerable quantities of smoke and steam from

the switch engine were carried to the eastward, and must have obscured the view of the east track north of State street.    The eastern gates were standing upright.    The presence of obstructions to the view, the noise of other moving engines, as well as the presence of an assurance of safety like the open gate, are very material facts when considering the question of what ought to be anticipated as the natural result of excessive speed.    The inference is entirely justifiable that the deceased saw no locomotive when he looked to the north on account of the presence of the smoke and steam, and that, on that account as well as on account of the apparent invitation of the open gate, he started to cross the east track. Knowledge of these conditions must be imputed to the servants of the railroad company who were operating the locomotive, and so the question is whether with such knowledge they should not have anticipated injury to some person as the result of the excessive speed.

How far up the track the deceased was able to look is not capable of proof, but the fact that he kept on his course steadily eastward, without hurrying his steps, justifies the inference that he could look far enough so that he would have been safe in crossing if the approaching locomotive was going at the rate of twelve miles an hour instead of at a higher rate. He had almost reached a place of safety when struck.    It seems fairly certain that a very small decrease in the speed would have spelled life instead of death.    We feel unable to say that the unlawful and negligent speed was not properly found to be the proximate cause of the accident.

No other questions require discussion.

*By the Court.*—Judgment affirmed.

BARNES, J. (*dissenting*).    Sec. 1809, Stats., imposes an absolute liability for injury at a grade crossing in cities, where a train is running at a speed of more than twelve miles an hour and not to exceed twenty miles an hour, unless

the railway company either maintains gates, a flagman, or an electric signal bell, provided the "injury . . . was caused by the omission . . . to comply with . . . the requirements of section 1809," and provided further that the party injured was not guilty of gross negligence. If the speed exceeds twenty miles per hour and does not exceed thirty, then the same rule of liability obtains unless the railway company maintains a flagman or gates.

I do not disagree with the conclusion of the court that none of the safeguards above provided for were maintained at the time of the accident. I also think that the jury might find that the accident would not have happened had the east gates been in working order. Still I think a case for recovery under the statute was not made out. As I read the evidence, it would not support a finding by the jury that the speed of the train at the time of the accident exceeded twenty miles an hour. The train might lawfully be run at this rate of speed if an electric bell had been maintained. The liability created by the statute does not exist in such a case unless the failure to maintain such a bell caused the injury. The proof is clear and uncontradicted that the gong in the tower was loud and clear when sounded and that it was constantly sounded from the time the deceased approached the west gates until he was struck. I am unable to see how any one can say that if a bell operated by electricity had been installed and was in working order the deceased would not have entered upon the tracks, when he disregarded a signal in every way as well calculated to give notice of the approach of a train. Unless it can be said that the electric bell would deter him although the gong did not, the absence of the electric bell did not cause the injury and the defense of contributory negligence would be available. The legislature no doubt prescribed the use of an electric bell because it works automatically and is sure in operation when properly cared for. That the deceased would

heed a bell operated by electric power when he disregarded a bell in every way as well calculated to give warning, operated by hand power, seems to me to be an extremely attenuated and speculative assumption. Admittedly the statute is a drastic one and effect should be given to that part of it which makes the liability absolute only in case the absence of the safeguards provided for causes the injury. In any case where a train is run over a grade crossing at a speed of more than twelve and not to exceed twenty miles an hour, where a party injured is guilty of contributory negligence he cannot recover without establishing the following facts: (1) that he was not guilty of gross negligence; (2) that neither the gates, electric bell, nor flagman provided by statute were maintained; and (3) that if any one of those three safeguards had been maintained the accident would not have happened. It is clear that where the speed does not exceed twenty miles an hour an injured party cannot claim the benefit of the statute by simply showing that if gates had been maintained the accident would not have occurred. In this case all three safeguards were lacking. If the injured party can make out a case by showing the absence of gates, he can make one by showing that there was no flagman or no bell. The railway company has the right to select the safeguard it will use, and it is only on a showing that any one of them would suffice that a case can be made. This, as it seems to me, is the plain and obvious meaning of the statute. If there was any evidence in the case tending to show that the electric bell would have been more likely to prevent this accident than would the hand bell, I could see my way clear to assent to an affirmance of the judgment. But there is no such evidence. Indeed the proof is quite to the contrary.

The jury did not pass on the actual speed of the train. If the record contains anything more than a mere scintilla of evidence to show that the speed exceeded twenty miles an

hour, then there has been a mistrial. No finding by the court upon the point can be presumed, because the evidence would not support it and because the defendant requested that a question be submitted to the jury specifically covering the rate of speed.

MARSHALL, J., concurs in the foregoing dissenting opinion.