McCaffrey, Administratrix, and another, Respondents, vs. Minneapolis, St. Paul & Sault Ste. Marie Railway Company and others, Appellants.

O'Brien, Administratrix, and another, Respondents, vs. Same, Appellants.

*April 28—September 15, 1936.*

312

For the appellants there were briefs by *Hayes & Hayes* of Milwaukee, attorneys, and *William A. Hayes* of Milwaukee and *Henry Lockney* of Waukesha of counsel, and oral argument by *Mr. William A. Hayes* and *Mr. Lockney*.

For the respondents there was a brief by *Edmund D. Walsh* of Waukesha and *Gregory Gramling* of Milwaukee, attorneys for Virginia McCaffrey and Catherine O'Brien, and *V. J. Collins* of Waukesha of counsel, and *Bendinger & Hayes,* of Milwaukee, attorneys for the St. Paul Mercury Indemnity Company, and of counsel for Virginia McCaffrey and Catherine O'Brien, and oral argument by *Mr. Gerald P. Hayes, Mr. Walsh,* and *Mr. Gramling.*

The following opinion was filed June 2, 1936:

FRITZ, J. The judgments under review were entered in actions in which the plaintiffs seek to recover from the defendants the damages sustained by Virginia McCaffrey, widow of Bernard McCaffrey, deceased, and by Catherine O'Brien, widow of Frank O'Brien, deceased, and by the estates of those deceased persons, as the result of alleged negligence of the defendants in their operation of a railroad engine and crossing signals on May 11, 1934. McCaffrey and O'Brien, who were employed in the fire department of the city of Waukesha, were killed while they were riding on a fire truck, which was responding to an alarm when it collided with the engine at the East Main street crossing in Waukesha. The truck was being driven by Charles Richards, a fireman, under the control of Lieutenant William Gedakovitz, who was in charge of the crew and sat on the front seat with Richards. McCaffrey and O'Brien were at the rear of the truck, on a platform which was several feet above the ground, and which was their post of duty in answering alarms. At the time of impact, they were thrown off the truck and sustained injuries from which they died shortly after without regaining consciousness. The complaints alleged causal negligence on the part of the defendants in operating the engine over the crossing without maintaining a proper lookout, and sounding a bell or whistle; and also in failing to give sufficient warning of the approach of the engine by means of the electric signal lights at the crossing.

In a special verdict the jury found that there was no negligence on the part of the engineer and fireman on the engine, in respect to properly keeping a lookout and ringing the engine bell. However, the jury further found that Jacob Schmidt, the towerman charged with the duty of operating the signals upon the approach of an engine, was negligent in failing to operate the signals so as to warn the operators of the truck in time to enable them to stop before reaching the track on which the engine moved; and that Schmidt's negligence in that respect was a cause of the collision which resulted in the deaths of McCaffrey and O'Brien. On the other hand, the jury found that there was also causal negligence on the part of Richards in respect to keeping a proper lookout, and his management, control, and speed in operating the truck; that there was causal negligence on the part of Gedakovitz in respect to keeping a proper lookout and giving warning to Richards; that forty per cent of the entire causal negligence was attributable to each of them; and that only twenty per cent of that entire negligence was attributable to Schmidt. However, neither the plaintiffs nor the defendants sought to join either Richards or Gedakovitz as defendants in the actions; and the court, in passing upon plaintiffs' motions after verdict, struck out all of the jury's findings in respect to Richards' and Gedakovitz's negligence as immaterial in the actions because it was not imputable to either McCaffrey or O'Brien, and therefore did not affect or impair the plaintiffs' rights to recover from the defendants the damages which they sustained by reason of Schmidt's negligence.

In appealing from the judgments, the defendants' first contention is that the jury's finding that Schmidt was negligent in respect to the operation of the signals is without any foundation in the evidence; and that, in any event, such negligence is wanting in proximate causation. In considering those contentions, it is important to note at the outset the following facts (undisputed) and legal propositions in respect to the installation and operation of those signals: They

were the so-called Griswold signals, which consisted of a rotating disc and a crossbar on a standard which supported them about five feet above the street surface. On the face of the disc was the word "STOP" in large letters. At each end of the crossarm, which was from four to five feet long, there was a red light. When the signals were not set to halt travel on the highway, the discs were parallel thereto. But, when the signal was set in operation to warn travelers as to the approach and crossing of a train or engine, the discs rotated upon the standard to a position at a right angle to the highway, and the red lights flashed alternately thirty to forty times a minute; and then the discs, with the lights flashing, continued in that position until the crossing was reopened for highway travel. For through trains there was automatic operation of the signals; but for switching movements there was manual operation by a man (hereinafter called the towerman) stationed in a tower, which, in respect to the signals involved herein, was six hundred twenty feet south of East Main street. That towerman was required to operate such signals for three highway crossings, two of which were south of Main street. He had to observe the switching movements, which necessitated manual operation of the signals, and had to use his judgment as to when, because of such movements, he should cause the signals to operate. He could set them in operation instantly by pressing a lever. At the East Main street crossing there were two of those signals, one on the north and the other on the south side of the street. They were thirty-five feet east and west, respectively, of the center of the track. They were installed three years before the accident pursuant to a city ordinance, which was duly enacted on April 21, 1931, under par. (b) of sub. (3) of sec. 192.29, Stats., and which required them to be installed and in operation within sixty days. The plans and specifications for the installation and operation thereof were approved by the public service commission, and one of its rules required that in

the operation of such signals an advance warning should be given twenty seconds in advance of the train's reaching the crossing, and not more than thirty seconds in advance thereof. That commission found the signals to be in good working condition upon its inspection thereof in November before the accident.

As the engine was approaching the crossing in question at less than fifteen miles per hour, and the engine bell was being rung properly, there was inapplicable in this case sub. (2) of sec. 192.29, Stats., which requires at such a crossing, while an engine or train is approaching or within twenty rods thereof, either the operation of gates, or the maintenance of a flagman in order that it may be run at a speed in excess of fifteen miles, but not to exceed thirty miles, per hour; or the maintenance and operation of an efficient electric alarm bell or signal properly installed and in good working condition, in order that it may be run at a speed in excess of fifteen miles, but not to exceed twenty miles, per hour. However, the enactment by the city of Waukesha of the ordinance, which required the installation of the Griswold signals at that crossing, was a proper exercise of authority conferred by par. (b) of sub. (3) of sec. 192.29, Stats., which reads as follows:

"Flagmen or gates shall be placed and maintained, or such mechanical safety appliances shall be installed upon such public traveled grade crossings in villages and cities as the city or village authorities may direct."

By virtue of its enactment under that legislative authorization, the ordinance in question was virtually thereupon in effect as a state statute, in so far as the ordinance imposed upon the operators of the railroad the duty to place, maintain, and properly operate the prescribed safety appliance. Therefore, upon the enactment of such an ordinance under that legislative authorization, the question as to the effect thereof involves the construction and effect of sec. 192.29, Stats.,

and not solely the ordinance. *Clark v. Chicago, M., St. P. & P. R. Co.* 214 Wis. 295, 300, 252 N. W. 685. And, as we said in that case:

". . . An examination of the provisions of sec. 192.29 indicates that all are designed to promote safety at railroad crossings by limiting the speed of trains and by providing travelers upon the intersecting highway with adequate and timely warning of their approach.

". . . The section evidences a clear legislative purpose to insure, so far as possible, that adequate warning be given to the traveling public. The speed of trains is made to depend upon the presence of a flagman, or the installation of mechanical safeguards. The ringing of the bell upon the engine is likewise required at crossings where such protection is not given. It was held in the *Jorgenson Case* [153 Wis. 108, 140 N. W. 1088] that with respect to mechanical appliances the statute required not merely installation but continuous, efficient operation. . . . If it means anything, and if the statutory purpose is to be accomplished, it means that the flagman must not merely be provided but that he must give the warning that he is hired to give. This is especially true in view of the fact that either gates, or a flagman, or other mechanical warning devices, are permitted at the crossing. They are treated on an equality so far as the statute is concerned, and in view of the construction of this statute by the *Jorgenson Case,* with respect to mechanical protective devices, we think the statute must be held to be violated in such a way as to bring into operation the slight want of ordinary care doctrine whenever the flagman, by reason of negligence imputable to the company under the doctrine of *respondeat superior,* fails to give the proper warning of the approach of trains."

Furthermore, aside from the duties imposed upon the railroad by virtue of that statute and the enactment of the ordinance thereunder, in as much as it had manually operated the Griswold signals for all trains and engines even though they approached and crossed at less than fifteen miles per hour, there was no longer any open question as to the necessity of proper operation thereof to promote safety at that crossing.

Under such circumstances, the failure to exercise ordinary care so as to operate them in time to be effective may constitute actionable negligence under the rule applied in *Burns v. North Chicago Rolling Mill Co.* 65 Wis. 312, 314, 27 N. W. 43; *Rohde v. Chicago & N. W. R. Co.* 86 Wis. 309, 312, 56 N. W. 872; *Bluhm v. Byram,* 193 Wis. 346, 349, 214 N. W. 364. As the court said in the case last cited:

"The absence of a signal from a flagman at a crossing where a flagman is regularly maintained is, like an open gate at the railway crossing, an assurance to the public that there is no danger and an invitation to cross in safety upon which the public has a right to rely. If the railroad fails to give protection to the public under such circumstances by lowering the gate or by signal from its flagman it is guilty of actionable negligence. . . ."

See also Restatement, Torts, p. 814, § 301.

In considering whether there was any actionable causal negligence on the part of Schmidt, the towerman, in view of the foregoing legal propositions under the facts in these actions, there must be noted the following additional facts which likewise appear without dispute, and also certain other facts, hereinafter stated, as to which the evidence is conflicting. At the crossing in question three railroad tracks crossed East Main street at right angles thereto. The street was straight and level for a considerable distance to the east and west of the tracks. The first intersection to the west was at Hartwell avenue, the east curb of which was two hundred twenty feet west of the west track and about two hundred forty feet west of the center of the center track. Hartwell avenue was twenty-six feet wide between curbs. There was a tank to supply water to engines three hundred fourteen feet along the tracks north of the center of East Main street, and nine hundred forty-two feet north of the tower in which Schmidt was stationed as the towerman. The engine in question, facing northward (with thirteen freight cars coupled at

its front end), stood at that tank until it started moving backwards, with the attached cars, toward the crossing, upon which it entered at a speed estimated at eight or twelve miles per hour. There was a small building, thirty-eight and one-half feet north of the center of East Main street, and forty-one feet west of the center track on which the engine traveled, which somewhat obstructed the view looking northward along the track when one approached from the west on East Main street. But there was evidence that from a point on the tracks, at one hundred feet north of the center of East Main street one could see one hundred feet west on that street; and from a point twenty feet north of the north crosswalk of East Main street it was possible to see three hundred feet west on the street.

The accident occurred at about 8:30 a. m. The truck, stationed west of Hartwell avenue and responding to an alarm sent in from a place east of the railroad crossing, traveled eastward on East Main street for some distance at a speed of forty miles per hour before reaching the intersection of those streets. When Richards, after crossing Hartwell avenue, realized that a collision between the truck and the engine was imminent, he tried to turn northward off East Main street into a private driveway near the west line of the railroad right of way, but the rear end of the truck swung around to the south and east, and the right rear side thereof struck the west side of the tender of the engine which was on the crossing.

Excepting as stated above, there is a decided conflict in the evidence as to other material facts in relation to the lookout kept by Gedakovitz and Richards; the latter's management, control, and speed in operating the truck; the movements thereof as it approached, crossed, and proceeded eastward from Hartwell avenue; and the time and promptness with which Schmidt operated the signals in relation to movements and relative positions of the truck and engine as they ap-

proached the crossing. In passing upon that conflicting evidence for the purpose of determining whether the jury's finding that Schmidt was negligent in failing to operate the signals in time to warn the operators of the truck so as to enable them to stop before colliding with the engine, we are governed by the rules that:

". . . When a verdict is taken and judgment is entered thereon, the sole question for determination in that respect on this appeal is whether there is any credible evidence which in any reasonable view fairly admits of an inference that supports the jury's findings. *Steubing v. L. G. Arnold, Inc.,* 210 Wis. 513, 246 N. W. 554;" and that:

". . . 'If there is any credible evidence, which under any reasonable view will support or admit of an inference for or against the claim or contention of any party, then what is the proper inference to be drawn therefrom is for the jury, and the court should not assume to answer such questions by substituting another answer after the verdict is returned.' (*Rupert v. Chicago, M., St. P. & P. R. Co.* 202 Wis. 563, 232 N. W. 550, 552)." *Borg v. Downing,* 221 Wis. 463, 266 N. W. 182, 183; *Trautmann v. Charles Schefft & Sons Co.* 201 Wis. 113, 115, 116, 228 N. W. 741.

Upon reviewing the proof and the inference of which it fairly admitted in the light of those rules, we find·that, notwithstanding decided conflicts in the evidence, the jury could consider facts also sufficiently established to the following effect: Upon approaching and entering the Hartwell and East Main street intersection, Richards and Gedakovitz looked to the south to ascertain whether fire apparatus stationed south of East Main street was also approaching, but, immediately upon crossing that intersection at a speed of thirty-five miles per hour, they directed their observations to the east. Gedakovitz, looking up and·ahead, saw that the signal lights were not in operation and that everything was clear, until the truck reached a point thirty-five feet east of Hartwell avenue. Then the signal lights came on for the first time, and the engine came into his view five feet north of the north cross-

walk. He immediately called to Richards to apply the brakes, and saw that he was already reaching for and applying them. Richards had noticed the engine coming into view when it was about ten feet north of that crosswalk, and applied the emergency brakes when the truck was fifty feet east of Hartwell avenue, but he did not see the lights flashed at all. The truck, which was twenty-two feet long and weighed fourteen thousand pounds, was equipped with hard rubber tires and only two-wheel brakes. An application of those brakes did not become effective for at least two seconds. In that time a vehicle traveling at thirty-five miles per hour would go at least one hundred two feet. There was no testimony that the brakes were defective, but Richards testified that on this occasion they did not seem to take hold. However, a civil engineer, who measured the skid marks, testified that they commenced one hundred fourteen feet west of the west rail of the west track, which placed their commencement at one hundred six feet east of Hartwell avenue. If, as seems probable, those marks were made by the rear wheel tires of that twenty-two feet long truck and began in two seconds after the brakes were applied by Richards, and he was seen by Gedakovitz to be applying them when the latter, upon seeing the signal lights first come on, called to him to apply the brakes, then the truck must have been at least east of Hartwell avenue when the signals were first put into operation by Schmidt. The fact that the truck had entirely crossed Hartwell avenue before the signal lights commenced to operate was corroborated by the testimony of several other witnesses. Their testimony was contradicted by a number of defendants' witnesses, who placed the truck west of Hartwell avenue when the lights were first flashed, but the issues under that conflicting testimony were clearly for the jury. If the jury believed, in view of the inferences of which the evidence admitted in favor of plaintiffs' contentions, that the signals were not flashed until Gedakovitz first observed them and the

engine first coming into view; that, upon his calling immediately to Richards to apply the brakes, Gedakovitz saw that Richards had reached to apply them; and that, notwithstanding that prompt application and the brakes operating effectively, as shown by the skid marks within about the usual time, it was physically impossible to stop the truck in the space available before colliding with the train, then it necessarily follows that the jury was warranted in finding that Schmidt failed to operate the signals at a time when the truck had not as yet approached so close to the track that it could not be stopped in time to avoid the collision. In other words, if, as Gedakovitz, Richards, and several other witnesses testified, there was no signal or other indication of the approach of the engine until it appeared just north of the north sidewalk, and if the brakes were applied by Richards as soon as he and Gedakovitz saw the engine and the latter, at the same time saw that the lights were flashed for the first time, and if, notwithstanding that prompt application of brakes and their taking effect as evidenced by the skid marks, the truck coming at the rate of thirty-five or forty miles per hour could not be stopped in time to avoid the collision, then it was within the province of the jury to find that Schmidt failed to operate the signals in time to enable the stopping of the truck. In that event, the jury could find him negligent in that respect if he, as an ordinarily prudent person, should reasonably have foreseen that injury would probably result as a consequence of his failure to act sooner.

On the issue as to foreseeability, it is of considerable significance that under the rule prescribed by the public service commission it was evidently considered necessary for the safety of travel on the highway to require the giving of warning at least twenty seconds in advance of a train or engine reaching a crossing. If such a warning had been given, the engine, approaching at eight or ten miles per hour, would have been about two hundred sixty feet, instead of only four

or five feet, north of the north sidewalk of East Main street when the Griswold signals would first have been set in operation by Schmidt; and in the event of a warning thus given when the engine was still two hundred sixty feet away, the approaching truck would have been warned in time. When, in addition to those circumstances, there are also taken into consideration the facts that East Main street was customarily traveled on fire runs to the east of the railroad tracks by the truck in question and the other apparatus that was expected to enter East Main street at the Hartwell avenue intersection, and that, because such apparatus is considerably heavier and required to travel at greater speed than other vehicles, its greater momentum required more time and space within which to bring it to a stop, it was, manifestly, within the jury's province to believe that Schmidt should reasonably have anticipated or foreseen probable injury as the result of such tardy operation of the signals. Likewise, if the jury was convinced that, to enable the stopping of the truck, approaching at that speed, in time to avoid the collision, Schmidt, in the exercise of ordinary care, should have operated the signals so that they would have been observable sooner than when the truck had proceeded to the east of Hartwell avenue, then it was also within the jury's province to find that Schmidt's failure in that respect was at least one of the causes of the collision.

Appellants contend further that the court erred in not dismissing the complaint against the defendant railway companies on the ground that the railroad instrumentalities and property involved were being operated by the defendant, Wallace, as receiver, and not by the corporate defendants. On that subject the record is confusing. However, it appears that Schmidt was employed and paid by the defendant Minneapolis, St. Paul & Sault Ste. Marie Railway Company for his services as towerman; that some of the property involved belonged to that corporation or the Wisconsin Central Railway Company; and that, upon the appointment of Wallace as

receiver, he and the other corporate defendant had entered into a contract which, however, does not seem to have been included in the bill of exception as a part of the record on appeal. It does appear, however, that at the outset of the trial one of defendants' counsel said, ". . . On the 3d day of December, 1932, the court, by special order, authorized Mr. Wallace to hire the Soo as an employee to run the trains, etc., because upon due showing made to the court he as a receiver had no machinery, no locomotives or cars, . . . and lack of help to run it; that it would have to cease entirely unless he was able to hire somebody under the order of the court to do that work for the court. . . ." In the absence of that contract and other material facts, we are not in a position to conclude that the trial court erred in declining to dismiss the complaints as to the corporate defendants and saying in that connection: "I don't think I could see my way clear to dismiss as to those two defendants, at this time. It looks to me from a sensible point of view that this railroad is being operated by the Soo Line over the Central tracks in the hands of a receiver, and that they are all before the court. I don't feel as though I would want to take the responsibility at this time to hold that there is no responsibility on their part as to their acts while they were operating this road under a receivership even. They at least are acting as the agent of the receiver in some way. They are so closely connected that I can't see where I could separate them. The motion is denied at this time." If, as seems probable, those corporate defendants were actually operating that property as agents for the receiver, then they are liable for the negligent operation thereof by their subagents or employees under the rule that "an agent is liable to third persons for the conduct of subagents and of his servants under the same conditions which make a principal liable for the conduct of an agent or servant." Restatement, Agency, § 362.

No error was committed by the court in omitting, in the absence of any application therefor, to join Richards and

Gedakovitz as parties defendant. Neither was there any error in ultimately striking out the jury's findings in respect to their negligence on the theory that those findings were immaterial in so far as the plaintiffs were concerned, because such negligence on the part of Richards and Gedakovitz could not be imputed to the plaintiffs and they are not chargeable therewith. *Reiter v. Grober,* 173 Wis. 493, 181 N. W. 739; *McCumber v. Rovelsky,* 203 Wis. 158, 233 N. W. 627; *Ring v. Minneapolis Street Ry. Co.* 173 Minn. 265, 217 N. W. 130; Restatement, Torts, §§ 491, 495.

Appellants further contend that error was committed in several other respects during the course of the trial. We find none that was prejudicial, and discussion thereof will serve no useful purpose excepting, possibly, in respect to the following incomplete and misleading statements by Edmund D. Walsh, one of plaintiffs' counsel, in his argument to the jury. He said: "When a siren is sounded, all vehicles, in the pathway of the travel of that fire-fighting apparatus, must make an effort to get out of the way and give the right of way to that piece of fire-fighting machinery, in order that it may discharge its duty in getting to the place of the fire-call as quickly as possible." Defendants' counsel duly objected on the ground that "the argument is a misstatement of the law. Vehicles on the street are one thing; a railroad train on a railroad track, a very different thing, and the right of way accorded to the railroad train, in the public interests, is clearly defined by law." The court merely said: "I will let it stand without any further instruction on it at this time, but I will make a special instruction on it in my instructions." No special instruction was given by the court in respect to the right of way of railroad trains. However, that the jury was not misled by the statement of plaintiffs' counsel, and seems to have believed the rule as to the right of way to be as contended in the statement of defendants' counsel, is rather indicated by the fact that the jury found that there was causal negligence on the part of Gedakovitz and Richards in several

respects, including the latter's management and control of the truck. In view of those findings, it seems improbable that the jury labored under any misunderstanding in respect to the engine's right of way at the crossing.

Likewise incomplete and misleading was the following statement by Mr. Walsh: "Let us assume that this jury would award both of these widows twelve thousand five hundred dollars, for what we call pecuniary loss, and then allowed the limit of twenty-five hundred dollars for loss of society and companionship—the two making a total of fifteen thousand dollars. Five per cent of that amount is a fair estimate, and, if you will compute five per cent, you get seven hundred fifty dollars—just about half of what Mr. O'Brien and Mr. McCaffrey were earning. These estimates give you some idea as to how you are going to arrive at the amount of damages you ought to award." Defendants' counsel rightly objected on the ground that it was an inadequate statement of the law. However, that inadequacy was duly remedied by the court's properly instructing the jury, in connection with an ample charge as to the damages recoverable by a widow for the loss of her husband's support, that "the amount of all such damages for loss of support and protection should be limited to such a sum as, being placed at interest, will each year, by taking a part of the principal and adding it to the interest, yield an amount sufficient for the support of the widow in accordance with her accustomed station in life during the time through which the husband would probably have lived and to the extent that he would have furnished support, if he had not been killed.

In addition, the record discloses improper and unfair remarks by counsel in the following respect: Mr. Walsh: "If you were placed in the position of Mrs. O'Brien, surrounded by her two children, would you have that kind of a husband taken away from you, upon the payment of fifteen thousand dollars?" Mr. Lockney: "Argument is objected to." Mr. Walsh: "Of course it hurts, I know, Henry, I know." The

evident attempt to improperly influence the jury to plaintiffs' advantage by such insidious remarks should have been promptly condemned by the court instead of apparently relying upon ample and correct instructions, which the court subsequently gave on the subject of the rightful elements and extent of the amount of plaintiffs' recovery, for the removal of such improper influences. The improper remarks were similar in effect to the statements disapproved in *Larson v. Hanson,* 207 Wis. 485, 242 N. W. 184; and *Lehner v. Chicago, M., St. P. & P. R. Co.* 204 Wis. 558, 236 N. W. 572. Such attempts at illegitimate argument seriously impair the integrity of a verdict and jeopardize the affirmance of a judgment rendered thereon. However, as we are not convinced that they operated prejudicially to the defendants herein, either in respect to the jury's findings as to negligence or the assessments of damages, we have concluded that they do not necessitate a reversal. See also *Becker v. Luick,* 220 Wis. 481, 264 N. W. 242.

Appellants also contend that, subsequent to the trial, the court erred in overruling their objection to the taxation in each action of alleged disbursements amounting to $204.80, claimed to have been incurred by the plaintiffs in each action on account of the attendance of the same witnesses on the same days and single trial of the two actions which were consolidated for that purpose. Plaintiffs seek to justify such double taxation of but a single disbursement by the decision in *Leonard v. Bottomley,* 210 Wis. 411, 418, 245 N. W. 849. That case is not in point. We then merely held that the plaintiff in the action appealed was entitled to have taxed as a disbursement items for the attendance and mileage of persons who testified on his behalf, although they were also in attendance as parties in actions consolidated for trial with the plaintiffs' action. That, so far as the question then actually decided was concerned, would not necessarily result in a double allowance by taxation on account of but a single disbursement to a witness for his attendance and testifying on but one trial.

In as much as the plaintiffs herein had consented to the consolidation of their actions for the purpose of the trial, there was in substance, so far as the conduct and procedure at the trial was concerned, but one trial at which the several plaintiffs in the actions as they were prior to consolidation thereof, constituted the parties plaintiff; and there was, likewise, but one attendance at but one trial on each day of the court's sessions by the witnesses as well as the jurors; and each of them was entitled to but a single per diem for each of those days. None of the witnesses called on behalf of and by the plaintiffs jointly at the trial, pursuant to the consolidation of the actions for that purpose, was entitled to receive pay in more than one action or proceeding for the same attendance or travel on behalf of the same parties plaintiff. Sec. 325.05 (2), Stats. Consequently, the taxation of costs was erroneous in that respect, and to that extent the judgments must be modified by retaxing the items constituting those disbursements so as to eliminate and avoid the improper double taxation thereof.

*By the Court.*—Judgments affirmed, excepting as to the modification directed in the opinion in respect to costs; and causes remanded for taxation of costs in accordance with the opinion. Respondents to recover costs on the appeal.

The following opinion was filed September 15, 1936:

PER CURIAM (*on motion for rehearing*). The matters presented on appellants' motion do not warrant a rehearing. The errors in describing the signal apparatus in the opinion as originally filed are inconsequential and do not materially affect the decision. They have been corrected.

However, upon appellants' motions in the alternative, we have concluded, upon reconsideration of the record, that the Wisconsin Central Railway Company is entitled to a modification of the mandate because the evidence does not establish a sufficient factual basis for holding that defendant legally

responsible for Schmidt's negligence in operating the signal lights. It does not appear sufficiently that he was employed by or acting on behalf of that defendant. He was apparently operating those lights as an employee of solely the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, in furtherance of its performance of its contract with the receiver Wallace to operate for him the railway property used in conducting the receivership business. Under those circumstances and the rule stated in the opinion, the Minneapolis, St. Paul & Sault Ste. Marie Railway Company is legally responsible for the negligence of its employee Schmidt; but in the absence of similar proof to establish a like basis for responsibility on the part of the Wisconsin Central Railway Company, the complaint must be dismissed without costs in so far as it is concerned. No costs are allowed in that respect because there was no separate appearance by counsel and no pleading or briefs were filed for solely that defendant. Accordingly, the original mandate is modified to read as follows:

Judgments affirmed as between the respondents and the defendants, Minneapolis, St. Paul & Sault Ste. Marie Railway Company and A. E. Wallace, as receiver of the Wisconsin Central Railway Company, excepting as to the modification directed in the original opinion in respect to costs, which are to be taxed in accordance with that opinion upon the remanding of the causes. The judgments are reversed as between the respondents and the defendant, Wisconsin Central Railway Company; and the causes are remanded with directions to enter judgments dismissing the complaints against that defendant without costs. Respondents are entitled to costs on appeal in this court against the Minneapolis, St. Paul & Sault Ste. Marie Railway Company and A. E. Wallace, as receiver; but no costs are allowed on the motion for rehearing.