PENNSYLVANIA RAILROAD CO. *v.* STATE OF
MARYLAND, TO USE OF MAY RUTH BREWER,
ET AL.

[No. 148, October Term, 1946.]

648

*Decided June 11, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Amos W. W. Woodcock* and *Fred W. C. Webb,* with whom was *Woodcock, Webb, Bounds & Travers* on the brief, for the appellant.

*Ernest C. Clark* and *Charles E. Hearne, Jr.,* with whom was *Michael Paul Smith* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

Edward Samuel Brewer, an employee of Harvey Johnson, was killed while riding in a truck driven by his employer, when the truck was demolished by a railroad locomotive at a grade crossing at Fruitland, Wicomico County, Maryland, in the early morning of February 5, 1945. The decedent was a widower, 48 years of age. His three minor children brought suit in the name of the State against the Railroad Company, in which they were joined by the Employees Liability Assurance Corporation, insurer of Johnson under the Workmen's Compensation Act, as a third party plaintiff. After a demurrer to the declaration had been overruled, the case came to trial before a jury in the Circuit Court for Wicomico County, resulting in an apportioned verdict for $12,859.89.

The facts alleged in the declaration and brought out in the testimony are somewhat unusual and, in the main, undisputed. Brewer had been employed by Johnson on the day previous to the accident, and was being transported to his place of employment, at the time of the accident, in a Chevrolet panel truck with longitudinal seats on both sides, and no side windows. Brewer was seated on the right side. There were 10 persons in the truck in addition to Johnson, the driver. The highway at Fruitland runs east and west, crosses the defendant's double track right of way at a right angle, and is 30 feet wide with 4 foot sidewalks on each side.

Approaching the tracks from the west, the view to the north is unobstructed; to the south, however, the view is obstructed by a post office building 30 feet from the west rail of the southbound track, and by a tool house located opposite a freight station some 300 feet to the south. The tracks to the south are straight for a distance of over seven miles. There is another grade crossing 537 feet to the south, and a whistle post for both crossings 1,900 feet to the south. The main crossing at Fruitland is guarded by automatic blinkers which flash red warning lights whenever trains moving either north or south approach the crossing.

On the morning of February 5 a southbound freight train reached Fruitland at about 20 minutes to eight (Eastern War Time). It stopped about 21 feet north of the crossing and some of the cars were uncoupled. The engine, with some cars attached, then moved south, completely blocking the crossing, and later backed to the north, clearing the crossing, for the purpose of switching some of the cars to a siding. During all of this time the warning signals were automatically in operation.

While the train was blocking the crossing a line of motor vehicles was halted on the west side. After the engine had backed to the north, clearing the crossing, the motor vehicles proceeded to cross. Johnson's truck was the fourth car in line. When this truck reached the center of the northbound tracks it was struck by a train coming from the south, at a speed of some 45 miles per hour. This second train was a special work train, bringing employees from Cape Charles to Delmar. The engineer testified that he blew his whistle, had his automatic bell in operation, and his headlight burning. The weather was cloudy and it was dawn. As described by one witness, it was "foggy, and between light and day."

The engineer of the northbound train testified that he saw the switching operation on the southbound tracks, and the automatic blinkers in operation when he was

over a mile from the crossing. He also saw three automobiles cross the northbound tracks from west to east, but did not see the Johnson truck. His fireman, who was on the west side of the cab, saw the Johnson truck "as it nosed past the postoffice," and called to him to stop. He was then some 300 feet from the crossing. Although he immediately applied his brakes and closed the throttle, the engine hit the truck broadside and carried it some 900 feet to the north. Brewer and Johnson and five of the other occupants of the truck were killed, the others injured.

The plaintiffs, in their declaration and in their proof, sought to establish negligence on the part of the defendant (1) in the conduct of the switching operation, and (2) in the operation of the northbound train. In support of the first ground they offered in evidence, over objection, certain rules of the defendant relating to switching operations, and produced testimony designed to show a violation of the rules, in that no flagman was left at the crossing when it was temporarily cleared. They also produced testimony as to a custom or practice of the defendant to provide a flagman during switching operations, which were conducted daily at this point. They also produced testimony that the engineer of the southbound train had seen the northbound train coming before he backed up and cleared the crossing. In support of the second ground, they rely upon alleged excessive speed of the northbound train, and failure of the engineer to slow down or stop when he saw the potentially dangerous situation.

The four rules of the railroad company which were offered in evidence read as follows:

"Rule 2453. When freight trains or engines are standing in the vicinity of road crossings at times when other trains or engines are approaching, or are about to move over a road crossing, a trainman from the standing train or engine will protect the crossing when possible to do so. Enginemen and conductors must see that the train

is stopped at least three hundred feet away from the crossing whenever practicable.

"Rule 2450 (5). When a train passes entirely over a highway crossing protected by automatic crossing signals, it must not move in the opposite direction over the crossing until protection is provided as prescribed in Rule 103-A."

"Rule 103-A. When a train is shifting over a public crossing at grade not protected by a watchman or gates, a member of the crew must protect the crossing unless otherwise provided.

"Rule 2450 (7). When shifting movements are made in the vicinity of a highway crossing protected by automatic highway crossing signals, or when a train is stopped, thereby operating the signals unnecessarily, every effort must be made by trainmen to avoid delay in highway traffic. When it is safe for vehicles or pedestrians to cross the track, the trainman will say, 'all right' and beckon to cross."

The defendant concedes the adoption of these rules and their admissibility in general. *State v. Baltimore & O. R. Co.*, 157 Md. 256, 145 A. 611. In contends, however, that they were inapplicable to the situation presented in the instant case, and hence not relevant. It argues that the freight train was not a "standing" train within the meaning of Rule 2453, because in railroad parlance a "standing" train is one completely coupled; that every member of the crew was employed and it was thus impossible to protect the crossing; and that the crossing was already protected by automatic crossing signals. We find no merit in these contentions. The expression "standing train or engine" seems broad enough to include a separation of the train into sections. Moreover, the rules taken together seem clearly designed to afford protection, in the shape of a flagman, against the danger from other trains or engines as well as from switching movements. They recognize the need for a warning in substitution for the blinkers, which would be meaningless or inadequate in such a situation, as a warning of the approach

of a second train. Whether it was possible or practicable to provide the substitute protection was a question properly left to the jury, in view of the testimony that there were five men in the train crew, and that a flagman had in fact been at the crossing during the initial stages of the switching operation, and that he left the crossing just before the engine backed to the north, clearing the crossing.

Nor do we find any merit in the defendant's contention as to the relevancy of the proof of custom. A number of witnesses testified that a flagman was always stationed at the crossing during the daily switching operations, and, in at least one instance, when another train was approaching during such operations. Three witnesses testified that a flagman was stationed there immediately prior to the accident, and climbed on the train when it moved to the north. Under such circumstances, the departure of the flagman might be construed as an implied invitation to cross. There was also direct testimony that the engineer saw the approaching train, but nevertheless cleared the crossing without leaving a flagman there.

The general rule applicable in such a situation is illustrated by section 301, comment f of the *Restatement, Torts: "Duty to continue customary warning.* The actor may customarily adopt a method of giving warning which is in excess of that which a reasonable man would regard as necessary. By so doing, he may cause those likely to be affected by his act to rely upon the continuance of such warnings and to regard their absence as an assurance of safety. If the situation is such that the actor should realize that this is the case, he cannot discontinue this practice without exercising reasonable care to give warning thereof, although he thereafter does all that would otherwise be reasonably necessary. Thus, a railway company may station a watchman or install safety gates or automatic signals at a crossing over which the traffic is not so heavy as to require such precautions. Having led the travelling public to regard the failure of the watchman to wave his flag as an

assurance that the track is clear, the company cannot discontinue the watchman without reasonable notice. So too, it must keep safety gates or signals in working order until they are removed or reasonable notice of their abandonment is given." See also *McCaffrey v. Minneapolis, St. P. & S. S. M. Ry.*, 222 Wis. 311, 267 N. W. 326, 268 N. W. 872.

The appellant contends, however, that there was no evidence that Brewer knew of the rules or the alleged custom, and that the defendant cannot be held liable unless it is shown that he knew of and relied upon such rules or custom. Nearly all the cases cited upon this point bear upon the question of contributory negligence, rather than primary negligence. *State v. Baltimore & O. R. Co., supra; Pennsylvania R. Co. v. Yingling*, 148 Md. 169, 129 A. 36, 41 A. L. R. 398; *Baltimore & O. R. Co. v. Windsor*, 146 Md. 429, 126 A. 119; *Baltimore & P. R. Co. v. Landrigan*, 191 U. S. 461, 24 S. Ct. 137, 48 L. Ed. 262. Knowledge or lack of knowledge of a custom to warn, or of the fact that customary protective signals have been abandoned or are not in operating condition, has an important bearing upon the question of the exercise of care by the plaintiff, but it does not affect the question of primary negligence. Compare *Krause v. Baltimore & O. R. Co.*, 183 Md. 664, 39 A. 2d 795, and *State v. Norfolk & Western Ry. Co.*, 151 Md. 679, 135 A. 827.

The appellant strongly relies upon the case of *Erie R. Co. v. Stewart*, 6 Cir., 40 F. 2d 855, 856, *certiorari* denied 282 U. S. 843, 51 S. Ct. 34, 75 L. Ed. 748. In that case the question was whether the trial court erred in charging the jury that the absence of a watchman, where one had been maintained by the defendant company at a highway crossing over a long period of time, to the knowledge of the plaintiff, would constitute negligence as a matter of law. The court held that it did, but said: "We are not now concerned with the extent of the duty owing to one who had no notice of the prior practice." In a concurring opinion, Judge Tuttle said:

"Having, in effect, given notice to the public traveling this highway that it would warn them of trains at this crossing, I think that it was bound to assume * * * that every member of such public would receive, and rely on, such notice * * * While undoubtedly lack of reliance by plaintiff upon the custom [of maintaining a watchman] has an important bearing and effect upon the question whether the plaintiff was guilty of contributory negligence, it seems to me clear that the knowledge or lack of knowledge of the plaintiff, unknown to the defendant, concerning such custom cannot affect the nature or extent of the duty owed to the plaintiff by the defendant or the performance of such duty." We think this is a correct statement of the law. It is true that negligence must be predicated upon a duty owed to the plaintiffs. The duty of care owed by a railroad company to users of the highway does not extend to trespassers or bare licensees, or at least the degree of care is different. *Jackson v. Pennsylvania R. Co.*, 176 Md. 1, 5, 3 A. 2d 719, 120 A. L. R. 1068; *Garland v. Boston & Me. R. R.*, 76 N. H. 556, 86 A 141, 46 L. R. A., N. S., 338, Ann. Cas. 1913E, 924. Similarly, the duty owed by a carrier to passengers or invitees, is different from that owed to users of the highway. *Dilley v. Baltimore Transit Co.*, 183 Md. 557, 39 A. 2d 469, 155 A. L. R. 627. But once the duty of care to a certain class of persons is established, there would appear to be no room for a contention that the primary obligation extends to some and not to others. Of course, in the instant case, contributory negligence of the truck driver, if any, could not be imputed to the passenger. *Frederick & Baltimore Transportation Co. v. Mumford*, 154 Md. 8, 139 A. 541; *State v. Norfolk & Western Ry.*, *supra*. There is no indication in the instant case, that Johnson's negligence, if any, was the sole proximate cause, or more than a concurrent cause, of the accident. *Davidson Transfer & Storage Co. v. State*, 180 Md. 63, 22 A. 2d 582. Upon the facts presented in the instant case, we hold that the demurrer was properly overruled

and the case properly submitted to the jury on the issue of primary negligence, without allegations or proof of knowledge on the part of Brewer. We express no opinion as to the negligence, if any, of Johnson, the driver of the truck.

On the second issue of negligence in the operation of the northbound train, however, we think the court erred in refusing the defendant's first prayer. This prayer, though possibly open to some objection as to form, sought an instruction from the trial court that there was no legally sufficient evidence from which the jury might find negligence in the operation of the northbound train. The appellees argue that the prayer was defective in that it sought to segregate a particular set of facts. It is a recognized principle that the segregation of a group of facts will make a prayer defective, if there are in the case other facts not included in that group which may be given the effect of qualifying or destroying the conclusion stated. *Friedman v. Hendler Creamery Co.*, 158 Md. 131, 140, 148 A. 426. But that principle does not apply where there are wholly independent issues. *Surratt v. Wagner*, 161 Md. 159, 161, 155 A. 315; *Poe, Practice* (5th Ed.), secs. 301, 301A. In the instant case, while there was legally sufficient evidence of negligence in the failure to provide additional warning at the crossing, we find no legally sufficient evidence of negligence in the operation of the northbound train, and we think the defendant was entitled to have that issue withdrawn from the consideration of the jury. In granting the defendant's 11th prayer, the jury was told to consider whether the defendant "failed to exercise reasonable care in the operation of its north or southbound train at the scene of the accident, or in protecting the public crossing at Fruitland." This instruction was too broad.

The appellees contend that the speed of the special train was excessive. Speed, in itself, is not negligence *per se.* *State v. Baltimore & O. R. Co.*, 171 Md. 584, 585, 597, 190 A. 231. At the time the truck entered the tracks, the northbound train was too close to be stopped short

of the crossing, and we find no evidence to support a theory of last clear chance. An engineer is not required to slow down or stop at every crossing. If that were the law, trains could not keep their schedules. "The rule is that persons operating a train are justified in assuming that others approaching a crossing over which it is about to pass, and who are at the time in a place of safety, will remain there until it has passed." *Klein v. United Rys. & Electric Co.*, 152 Md. 492, 507, 137 A. 306, 311, an cases cited. According to the undisputed testimony the engineer sounded his whistle and bell, the brakes were in proper condition, and he stopped as soon as he could after he became aware that the truck was in a position of danger. The failure of the court to adequately instruct the jury on this branch of the case constitutes reversible error.

The appellant contends that the plaintiffs' 2nd prayer on the subject of imputed negligence, granted by the court, was incomplete, and stated a proposition which, standing alone, would not justify a finding for the plaintiffs. But we think there is no requirement that each prayer should cover the entire case; all of the granted prayers should be considered together as establishing the law of the case. Where an oral charge is given, we have indicated that qualifying language in one portion of the charge may be taken to avoid the possibly misleading effect of other portions. *Mitchell v. Dowdy*, 184 Md. 634, 644, 42 A. 2d 717. While Rule 6, III, Trials, Practice and Procedure, does not in terms alter the technical rules applicable to prayers under the old practice, even before the adoption of this rule this court said: "In determining the correctness of this prayer we must not only consider the part to which objection is made, but in connection with it we must also consider the conceded portion of the prayer as well as the other granted prayers in the case, in respect to the evidence offered." *Hochschild, Kohn & Co. v. Cecil*, 131 Md. 70, 78, 101 A. 700, 703.

658

The appellant contends that the plaintiffs' damage prayer was incorrect in permitting the jury to allow compensation to the infant daughters until they should respectively "attain the age of 21 years," and points out that for many purposes, girls may be emancipated at the age of 18. We find no merit in this contention. The common-law rule as to majority still prevails in this State where not modified by statute. *Greenwood v. Greenwood,* 28 Md. 369. Compare *Employers' Liability Assur. Corp. v. Baltimore & O. R. Co.,* 173 Md. 238, 195 A. 541.

*Judgment reversed and new trial awarded, with costs.*